(C.D. 2258)

Arthur J. Fritz & Co. *v.* United States

United States Customs Court, Second Division

(Decided May 22, 1961)

*Lawrence & Tuttle* (*Edward N. Glad* and *Barnes, Richardson & Colburn* of counsel) for the plaintiff.

*William H. Orrick, Jr.*, Assistant Attorney General (*Sheila N. Ziff, Samuel D. Spector*, and *Alfred A. Taylor, Jr.*, trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges; LAWRENCE, J., not participating

FORD, Judge: The merchandise involved in the suits listed in schedule "A," annexed hereto and made a part hereof, consolidated for purpose of trial, consists of certain pulp drying equipment and parts thereof.

The collector assessed duty at the rate of 17½ per centum ad valorem under paragraph 353 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, on the merchandise covered by protest 59/9105, which is described on the invoice as "24-Special Circulating Fans including drives & belts. Pulp mill equipment," as articles having as an essential feature an electrical element or device, such as blowers and fans. The merchandise covered by the remaining protests were assessed with duty at the rate of 13¾ per centum ad valorem under paragraph 353 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade,.86 Treas. Dec. 121, T.D. 52739, as other articles having as an essential feature an electrical element or device.

Plaintiff contends that all of the merchandise involved in these suits is properly dutiable at the rate of 9½ per centum ad valorem under paragraph 372 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, as machines or parts thereof for making paper or paper pulp.

The pertinent portions of the statutes involved are as follows:

Paragraph 353, Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, *supra*:

Articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy, and articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs; all the foregoing (not including electrical wiring apparatus, instruments, and devices), finished or unfinished, wholly or in chief value of metal, and not specially provided for:

   \* \* \* fans; blowers; \* \* \*_____ 17½% ad val.

Paragraph 353, Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, *supra*:

Articles having as an essential feature an electrical element or device, \* \* \*, wholly or in chief value of metal, and not specially provided for:

   \*      \*      \*      \*      \*      \*      \*

   Other \* \* \* _____ 13¾% ad val.

Paragraph 372 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, *supra*:

Machines, finished or unfinished, not specially provided for:

   \*      \*      \*      \*      \*      \*      \*

   Combination candy cutting and wrapping machines; machines for making paper or paper pulp; machines for packaging pipe tobacco; machines for wrapping candy; and machines for wrapping cigarette packages.    9½% ad val.

   \*      \*      \*      \*      \*      \*      \*

Parts, not specially provided for, wholly or in chief value of metal or porcelain, of any article provided for in any item 372 in this Part.    The rate for the article of which they are parts.

The record herein on behalf of plaintiff consists of the testimony of one witness and the receipt of three exhibits. The defendant offered the testimony of one witness, and four exhibits were received on behalf of defendant. A brief description of the seven exhibits received in evidence is as follows:

*Plaintiff's exhibit 1*: Schematic drawing of a pulp drier, designed by plaintiff's witness, Tore Ahlen, with the fans identified by the letter "A," the rods or pulp drier conveyor by the letter "B," and the steam coils by the letter "C."

*Plaintiff's exhibit 2*: Photograph illustrating the steam coils identified by the letter "C."

*Plaintiff's exhibit 3*: Photograph of a complete pulp drying machine containing the imported articles, the outer casing of the blowers or fans being identified by the letter "A," and the pulp coming out of the machine by the letter "D."

*Defendant's exhibit A*: Photograph of the machine seen by John H. Moak, defendant's witness, stipulated to be the machine shown him by the examiner as containing the identical articles involved in this case. The fans are on the

right-hand side of the exhibit and the motors, which drive the fans by "Texrope" drives, are on the left-hand side.

*Defendant's exhibit B*: Photograph showing the double-ended motor which drives the shaft that runs the full length of the pulp drying machine, which shaft, in turn, drives the conveying mechanism for the sheet through the machine, and which shaft connects to a right-angle gearbox on both the wet and the dry end of the machine.

*Defendant's exhibit C*: Photograph showing the drive from the right-angle reduction unit, which drives the individual conveyors which carry the sheet through the machine.

*Defendant's exhibit D*: Photograph showing the steam coils in the machine, and, in the background, the pass that the sheet goes through.

Mr. Tore Ahlen, vice president of the importer herein, was called to testify on behalf of plaintiff. Mr. Ahlen testified that he is a graduate mechanical engineer and has been working primarily with pulp drying equipment since 1933; that, since 1939, he has been living in the United States and Canada and is presently a citizen of Canada; that, since that date, he has visited most of the pulpmills in the United States and Canada; that he is also associated with the firm of Lundberg Ahlen Equipment, Ltd., Vancouver, B.C.; that the business of both of these firms is pulp and paper mill equipment and processing.

Mr. Ahlen then testified that his duties cover engineering design and the training of crews, as well as selling; that he actually designs the machines, controls the manufacture, controls the installation, and trains the crews to operate the machines in the United States; that the circulating fans are specially designed type fans, having an outer casing in a **U**-shaped form; that each fan has a shaft going through it with two impellers or turbinetype fan runners; that the shaft must be driven by an electric motor, a steam turbine, or a combustion engine; that there are no electrical motors connected to the fan when imported, although the actual installation in the United States utilizes electric motors; that the purpose of the fan is to maintain forced circulation in the drier.

The witness further testified that the cross-members to the pulp conveyors and the special steam coils for the driers are designed by him to be used in a particular drier also designed by him; that on top of the drier is a shaft running the full length of the drier; that from this shaft both ends are connected to chain drives going to the various conveyor shafts which move the pulp drier conveyor; that in its condition, as imported, there are no electrical elements in the cross-members of the conveyor belt; that said belt could be operated by a DC motor, such as is the case herein, or by any other means of power; that the purpose of the conveyor is to move the pulp through the drier; that the steam coils in the pulp drier heat the air and dry the pulp by convection and radiation heat transfer; that the source of heat is steam, which is condensed

in the steam coils; that the steam coils in their condition, as imported, have no electrical elements. The witness then testified that he has never heard of any of the particular fans or the other merchandise involved herein being used in anything other than the particular pulp drier for which it was designed; that the pulp drying machine could not operate without the involved merchandise; that the purpose of the pulp drying machine is to remove the water from the pulp web which, at the time it enters the pulp drier, may contain 60 per centum water and which has only 10 per centum water when it leaves the drier; that, prior to entering the drier, the pulp goes through a sheet forming machine and a press section, which mechanically removes as much water as it can before sending the pulp on to the involved pulp drier; that the pulp in sheet form enters the involved drier and traverses the length of the drier nine times, at which point, it leaves the drier and passes on to a slitter and cutter, which cuts up the continuous web into a number of sheets; that these sheets then go to a baler and the bale is shipped to the customer.

Mr. Ahlen admitted that the actual installation of the involved machine was made with 24 AC motors to operate the circulating fans and a DC motor to operate the conveyor system. He indicated that the installation of the machine herein also required two more motors to operate the exhaust and supply fans. The steam coils not being driven are not operated by any electrical motors.

Defendant's witness, Mr. John H. Moak, a plant engineer for Crown Zellerbach, whose business is the manufacture of paper, testified that he is in charge of engineering, maintenance, and power, and has been employed in that capacity for 11½ years; that he is a civil engineer and a licensed professional engineer in the States of Washington and Oregon and has been in engineering work in paper mills since 1929; that he and two customs employees visited the Spaulding Pulp Paper mill to observe the installation of the actual drier involved herein.

Mr. Moak then testified and produced various photographic exhibits to the effect that the blowers and fans were connected to electric motors by "Texrope" drives; that the conveying mechanism was connected to a double-ended motor, and the shaft ran the full length of the machine and connected to a right-angle gearbox at both ends of the machine; that he has seen many machines such as the machine involved herein and would, from his experience, state that the electrical elements in the drier and fans were essential to their operation; that conversion from electric power to other sources of power would require complicated changes which have to do with the source of power and not the drier itself.

There is no dispute in the record that the fans, metal rollers, and steam coils involved herein, in their condition, as imported, contain no electrical element or device. The record also substantiates the fact that the imported merchandise was designed for and dedicated to use in a pulp drying machine, without which said machine could not function. Therefore, for tariff purposes, the involved importations are parts of the involved pulp drier. *United States* v. *Antonio Pompeo*, 43 C.C.P.A. (Customs) 9, C.A.D. 602.

Whether the merchandise, such as is involved herein, which in its condition, as imported, contains no electrical element or device, is properly classifiable under paragraph 353 of the Tariff Act of 1930, as modified, *supra*, has recently been before the court in the case of *United States* v. *Baker Perkins, Inc., R. F. Downing Co., Inc.*, 46 C.C.P.A. (Customs) 128, C.A.D. 714. In the *Baker Perkins* case, *supra*, a certain Cocoa Liquor Grinding Mill containing in its condition, as imported, no electrical element or device, was classified under paragraph 353 of the Tariff Act of 1930. The record therein established that the importer intended to and actually utilized electric power for the machine which merely contained a shaft to which a form of motive power was to be attached. The record in that case also established that any other means of power could be applied to the machine, although, from a practical commercial standpoint, electricity was the only motive source that could be applied.

The court of appeals, in arriving at its conclusion, made the following comments, which we deem to be applicable herein:

\* \* \* The fact that other power sources would not be practical in appellees' operation cannot be controlling here because it is well settled that the classification of an imported article must rest upon its condition as imported, and that condition in this case did not limit the drive to an electric motor. The mere contemplation of the use of electric motive power is not sufficient to constitute the machine an article having as an essential feature an electrical element under paragraph 353.

In the case at bar, 24 fans were imported without electric motors, and the evidence adduced herein was similar to that in the *Baker Perkins* case, *supra*, i.e., any source of power could be used as a prime mover without any change to the imported machine. Although fans and blowers are some of the exemplars in paragraph 353 of the Tariff Act of 1930, as modified, *supra*, it is well established that said fans or blowers must be electric fans or blowers. *John A. Steer & Co.* v. *United States*, 24 C.C.P.A. (Customs) 293, T.D. 48737; *United States* v. *Dryden Rubber Co.*, 22 C.C.P.A. (Customs) 51, T.D. 47050.

At this point, it is fair to state that Mr. Moak, called on behalf of defendant, testified that a complicated, costly, and bulky installation would be required if a source of power other than electricity were used.

However, Mr. Moak admitted that these modifications or additions would not be a part of the pulp drier involved herein. The nature of the modification, whether it is simple or complicated, is an important factor in determining the principle of law involved herein. In addition, modification of the machine *per se* is required in order to establish lack of interchangeability of the source of power. Any changes or modifications apart from the machine *per se* are insufficient to establish lack of interchangeability. *Clarence S. Holmes* v. *United States*, 37 Cust. Ct. 260, C.D. 1833. Accordingly, it has been satisfactorily established that the involved pulp drier in its condition, as imported, did not contain any electrical element or device and that said pulp drier is subject to operation by a source of power other than electricity, without any modification or change to the machine *per se*.

Following the principles of law set forth in the *Baker. Perkins* case, *supra*, we are of the opinion that the involved pulp driers are not properly classifiable under the provisions of paragraph 353 of the Tariff Act of 1930, as modified, *supra*. In view of the foregoing, the issue before the court is what is the proper classification of the involved pulp driers?

The evidence herein establishes that the imported machine in its operative condition, takes a pulp sheet or web, which has already been through a mechanical process to remove water, and, by means of thermal drying, removes water from the pulp sheet. The witness, Mr. Ahlen, testified that, prior to entering the involved drier, the pulp sheet may contain as much as 60 per centum water and, when it leaves the machine, after traversing its length nine times, may contain as little as 10 per centum water. The record also establishes that the final product from this machine is merely slit into sheets and baled as a completed product.

We are of the opinion that since all of the operations performed by the machine were prior to the completion of the manufacture of the pulpboard produced, the involved machine falls within the purview of paragraph 372 of the Tariff Act of 1930, as modified, *supra*, as machines for making paper or paper pulp, as claimed by plaintiff herein, since "pulpboard" is described in the Dictionary of Tariff Information (1924), as "paper" nine one-thousandths of an inch or more in thickness. *John S. James, a/c the Consolidated Packaging Corporation* v. *United States*, 43 Cust. Ct. 133, C.D. 2116; on rehearing *Same* v. *Same*, 45 Cust. Ct. 248, Abstract 64481, affirmed 48 C.C.P.A. (Customs) 75, C.A.D. 768 (decided April 14, 1961).

To the extent indicated, the claim in the protests is sustained; in all other respects and as to all other merchandise, all the claims are overruled.

Judgment will be rendered accordingly.