(C.D. 2443)

SUPERWOOD CORPORATION *v.* UNITED STATES

United States Customs Court, Second Division

(Decided April 13, 1964)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*John W. Douglas*, Assistant Attorney General (*Morris Braverman*, trial attorney), for the defendant.

FORD, Judge: The merchandise in question consists of various pieces of equipment covered by five separate entries made at the port of Duluth, Minn. The merchandise was assessed at various rates of duty on each of the entries as follows:

| Entry No. | Description on invoice | Assessed |
|---|---|---|
| 114 | 1 Hydraulic metal press. Spare parts for same. 2 Extra heating platens. 1 Soderhamn Wet Forming Machine. | Paragraph 372, as machines, not specially provided for, other, 13 per centum ad valorem. |
| 260 | 2 Hoists. 4 Double Columns. 2 Doors. 1 Pusher, complete. 1 Extractor, complete. | Paragraph 353, as articles having as an essential feature an electrical element or device, 13¾ per centum ad valorem. |
| | 2 Automatic Centers. | Paragraph 353, as articles suitable for controlling and distributing electrical energy, 15 per centum ad valorem. |
| 270 | 4 Roller ways at cross conveyors. 4 Cross conveyors. 3 Chain conveyors. 2 Chain Conveyors in charging and discharging hoist. 1 Roller way for cleaning machine. | Paragraph 353, as articles having as an essential feature an electrical element or device, 13¾ per centum ad valorem. |
| | Automatic centers. | Paragraph 353, as articles for controlling and distributing electrical energy, 15 per centum ad valorem. |
| 307 | Wet Lap Conveyor, 1st section Wet Lap Conveyor, folding section, magnet coupl., Roller way Wet Lap Conveyor, section 2, 3 resp. 4. Reversible Wet Lap Conveyor. Brush cleaning machine. Sheet separator. Belt conveyor. | Paragraph 353, as articles having as an essential feature an electrical element or device, 13¾ per centum ad valorem. |
| 315 | Limit Switches. Air Pressure details. | Paragraph 353, as electrical switches, 17½ per centum ad valorem. |

Plaintiff contends that since the various pieces of equipment were assembled for the manufacture of hardboard, they should have properly been assessed with duty at the rate of 9½ per centum ad valorem under the provisions of paragraph 372 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, as machines for making paper or paper pulp. It is alternatively claimed that the various pieces of equipment assessed with duty under the provisions of paragraph 353 of the Tariff Act of 1930, as modified, are properly dutiable at the rate of 13 per centum ad valorem under the provisions of said paragraph 372, as modified, *supra*, as machines, other.

The pertinent portions of the provisions involved herein read as follows:

Paragraph 353 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802:

Articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy, and articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs; all the foregoing (not including electrical wiring apparatus, instruments, and devices), finished or unfinished, wholly or in chief value of metal, and not specially provided for:

Switches and switchgear which are not wiring apparatus, instruments, or devices; fans; blowers; and washing machines____ 17½% ad val.

\* \* \* \* \* \* \*

Other articles \* \* \*_____ 15% ad val.

Paragraph 353 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739:

Articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs, finished or unfinished, wholly or in chief value of metal, and not specially provided for:

\* \* \* \* \* \* \*

Other \* \* \*_____ 13¾% ad val.

Paragraph 372 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108:

Machines, finished or unfinished, not specially provided for:

\* \* \* \* \* \* \*

\* \* \* machines for making paper or paper pulp; \* \* \*__ 9½% ad val.
Other \* \* \*_____ 13% ad val.

The basic issue presented to the court is whether the various pieces of equipment involved in the importations herein comprise machines for making paper, within the purview of paragraph 372, as modified, *supra*. The alternative claim under the provisions of paragraph 372, as modified, *supra*, for machines, other, presents the secondary principle of whether the articles involved in the importation herein have as an essential feature an electrical element or device, or otherwise fall within the purview of paragraph 353, as modified, *supra*.

The record herein consists of the testimony of two witnesses, Mr. Morris J. Opsahl, called on behalf of the plaintiff, and Mr. William C. Rindsland, called on behalf of the defendant, as well as two blueprints, received in evidence as plaintiff's exhibits 1 and 1–A, and six pieces of hardboard produced by the importer, which was received in evidence as plaintiff's collective illustrative exhibit 2. Without dwell-

ing at length on the record at this point, it has been clearly established that the imported equipment was specially designed and manufactured for the sole purpose of making hardboard at the plant of the importer. It has further been established that each of the imported components constitutes an integral and essential part in the production of hardboard.

The paragraph claimed to be applicable by the importer herein provides for machines for making paper. Implicit in the use of the plural, "machines," as well as facts of which the court may take judicial notice, is the fact that there is no single machine designed or sold for the manufacture of paper. *Bird Machine Compony* v. *United States*, 51 CCPA 42, C.A.D. 835.

In order for plaintiff to prevail, it must establish the importations to be machines or parts thereof used for making paper. The record establishes that this integrated group of machines is used in the manufacture of hardboard. The operation of the imported equipment was described by Mr. Opsahl as follows:

After the fiber has been refined and held under agitation in the vats below the machines, it is then pumped first to the machine described as circled as "B," which in the paper making game is known as a Fourdrinier wet forming machine. Its purpose is to dewater the slurry and by slurry, I mean the mixture of cellulose fiber and water and leave the felted mat of that cellulose fiber on a moving wire which progresses from the start of the machine over to its end.

\* \* \* \* \* \* \*

The wire carries the mat forward and it goes through the press rolls to extract further water. The aim being to firm the sheet up enough by the extraction of water so that it may be carried on the wet lap conveyor. After—just before leaving the Fourdrinier machine, the sheet is cut by a flying saw into sections 4 ft. long and 4 ft. wide and a little over 16 ft. long. Such wet lap sections are then conveyed by the wet lap conveyor over toward the press.

JUDGE FORD: Would you explain to the Court what you mean by these wet lap conveyors? What are wet lap conveyors? How does a wet lap conveyor operate?

THE WITNESS: It is specially arranged, it is a specially arranged design of conveyor to carry these fragile unpressed wet laps of fiber from one point of the process to the next step of the process without injuring them.

\* \* \* \* \* \* \*

Q. You are up to the conveyor. Would you continue with the process please.— A. The wet lap is carried by the wet lap conveyor down to a point where the wet lap conveyor for a short distance travels above the chain conveyor which runs parallel to the press and does what we call accomplish the shuttling of the press plates around in through and out of the press. At that particular point where the reversing action of the wet lap conveyor takes place, the wet lap reverses and runs in the reverse direction and is placed upon the transport plate. At that time, traveling in the same direction, that transport plate with its wet lap then goes forward to the cross conveyor which carries it over to another section of chain conveyor which accomplishes, you might say, a 90 degree change of direction and carries the transport plate with its wet lap into the loading hoist. When 20 such sheets have been accumulated in the loading hoist, the press then has no doubt finished drying the preceding charge and the press opens.

At that same time, the extractor comes in from the opposite end of the press and starts the extraction of the 20 sheets in the press and simultaneously, the pusher comes in behind the loading hoist and starts to push in the fresh 20 sheets into the press for drying and pressing. It is a continuous process. The forming machine makes sheets continuously. The press is cycling continuously and this goes on without interruption unless there are minor troubles twenty-four hours a day, seven days a week, with the exception of a very limited amount of cleaning time once a week.

Q. And, what is the product which comes out of the end of the line?—A. Well, I would refer to it as hardboard. It is a pressed pulp board. It is made of a felted sheet of fiber drawn under suction.

The manufacturing process is quite similar to that employed for the production of the merchandise under consideration in the case of *F. S. Whelan & Sons* v. *United States*, 40 Cust. Ct. 192, C.D. 1982. In the *Whelan* case, *supra*, the merchandise involved was the end product, "hardboard," and not the machines used for its manufacture. One of the questions presented therein was whether hardboard fell within the paper schedule, schedule 14, viz, paragraph 1402 of the Tariff Act of 1930 or paragraph 1413 of said act, or under the wood schedule, schedule 4, specifically, paragraph 412 of the Tariff Act of 1930. So far as is pertinent herein, the court held the hardboard involved therein to fall within the term "pulpboard" in the paper schedule.

In the case of *Floral Arts Studio et al.* v. *United States*, 46 CCPA 21, C.A.D. 690, which involved rice paper, the court made the following statement:

We have found nothing that would indicate that the Congress intended the term "paper" as used in the Tariff Act of 1930 or any previous acts, to have a purely technical or scientific meaning. Therefore, we can assume that the Congress attributed the common meaning to the word "paper" when using it in this connection. The question before us is whether the imported merchandise comes within the common meaning of the word "paper" as used in the Tariff Act.

Accordingly, the court may resort to dictionary and other technical authorities in order to determine whether the product manufactured by the imported equipment falls within the common meaning of the term "paper." The following is the definition of "paper," set forth in The Dictionary of Paper, published under the auspices and direction of the American Paper and Pulp Association, 1951:

PAPER.—(1) (General term). The name for all kinds of matted or felted sheets of fiber (usually vegetable, but sometimes mineral, animal or synthetic) ; formed on a fine wire screen from a water suspension. Paper derives its name from papyrus, a sheet made by pasting together thin sections of an Egyptian reed (*Cyperus papyrus*) and used in ancient times as a writing material. (2) (Specific term). One of the two broad subdivisions of paper (general term), the other being board (*q.v.*). The distinction between paper and board is not sharp but, generally speaking, paper is lighter in basis weight, thinner, and more flexible than board. Its largest uses are for printing, writing, wrapping, and sanitary purposes, although it is also employed for a very wide variety of other uses.

In the *Floral Arts* case, *supra*, the following definition of "paper" was set forth:

A New English Dictionary on Historical Principles, Oxford (Clarendon Press), 1909, Vol. 7, page 436, defines paper as follows:

1.  A substance composed of fibres interlaced into a compact web, made * * * from various fibrous materials * * * which are macerated into a pulp, dried, and pressed * * *.

    b.  Also applied to other substances used for writing upon, of similar consistency but differently made, as the *Papyrus* of the ancients; * * *.

    1613.  Purchase Pilgrimage (1614) 506 of the pith or heart of the tree, is made paper for books.

    1615.  G. Sandys Trav. 102. The sedgie reeds, * * * called formerly *Papyri*, of which they made paper; and whereof ours made of rags, assumeth that name.

Modern Pulp and Paper Making, 3d edition, revised and edited by John B. Calkin, sets forth the definition of paper, as given in "The Dictionary of Paper" and as quoted above.

The testimony of Mr. Rindsland, called on behalf of defendant, to the effect that the merchandise produced was not, in his opinion, "paper" is, of course, only advisory, since "common meaning" is a question of law to be determined by the court. Mr. Rindsland, an engineer, was well qualified in the field and testified primarily about the manufacture of fine paper, as opposed to hardboard. He did also refer to insulation board, manufactured by his company, which was similar but which, in his opinion, was not paper. However, based upon the holding in the *Whelan* case, *supra*, and the dictionary definitions and technical authorities, cited, *supra*, as well as the fact that both witnesses agree that the end product is manufactured from pulp, is made in layers with the water extracted, and is composed of fibers which have been interlaced into a web and then made into a pulp which has been dried and pressed, we are of the opinion that the imported equipment is used as a group of integrated machines for making paper and, accordingly, falls within these terms, as utilized in paragraph 372, as modified, *supra*.

In view of the foregoing, it is not necessary to consider whether said machines fall within the purview of the various sections of paragraph 353, as modified, *supra*. Since the provision for machines for making paper is more specific, it must prevail over paragraph 353, *supra*.

The claim in the protest that said merchandise is properly dutiable at 9½ per centum ad valorem under paragraph 372, as modified, *supra*, as machines for making paper and parts thereof is, accordingly, sustained. All other claims are overruled.

Judgment will be rendered accordingly.