**AMERICAN SF PRODUCTS, INC.**

**v.**

**UNITED STATES.**

**C.D. 3593; Protest No. 66/58393–19528–66.**

United States Customs Court,
Second Division.

Oct. 21, 1968.

Barnes, Richardson & Colburn, New York City (James S. O'Kelly and Joseph Schwartz, New York City, of counsel), for plaintiff.

Edwin L. Weisl, Jr., Asst. Atty. Gen. (Arthur Steinberg and Herbert P. Larsen, New York City, trial attorneys), for defendant.

Before RAO, Chief Judge, and FORD, Judge.

FORD, Judge:

The merchandise involved in this case consists of spare parts for a Flakt Dryer, type L, imported from Sweden and entered at the port of New York on October 18, 1965. It was assessed with duty at 12½ per centum ad valorem under item 661.70, Tariff Schedules of the United States, as parts of industrial machinery for the treatment of materials by a process involving a change of temperature, and is claimed to be dutiable at 7 per centum ad valorem under item 668.06, as parts of machines for making cellulosic pulp, paper or paperboard.

The pertinent provisions of said tariff schedules are as follows:

Schedule 6, part 4

Subpart A. Boilers, Non-Electric Motors and Engines, and Other General Purpose Machinery

Subpart A headnote:

1. A machine or appliance which is described in this subpart and also is described elsewhere in this part is classifiable in this subpart.

\* \* \* \* \* \* \* \*

Industrial machinery, plant, and similar laboratory equipment, whether or not electrically heated, for the treatment of materials by a process involving a change of temperature, such as heating, cooking, roasting, distilling, rectifying, sterilizing, pasteurizing, steaming, drying, evaporating, vaporizing, condensing, or cooling; instantaneous or storage water heaters, non-electrical; all the foregoing (except agricultural implements, sugar machinery, and machinery or equipment for the heat-treatment of textile yarns, fabrics, or made-up textile articles) and parts thereof:

\* \* \* \* \* \* \* \*

661.70  Other ................................... 12.5% ad val.

\* \* \* \* \* \* \* \*

Subpart D. Pulp and Paper Machinery; Bookbinding Machinery; Printing Machinery

Machines for making cellulosic pulp, paper or paperboard; machines for processing or finishing pulp, paper, or paperboard, or making them up into articles:

668.00  Machines for making cellulosic pulp, paper, or paperboard ............................ 7% ad val.

\* \* \* \* \* \* \* \*

Parts of the foregoing machines:

\* \* \* \* \* \* \* \*

Other:

668.06  Parts of machines for making cellulosic pulp, paper, or paperboard ...................... 7% ad val.

The evidence consists of seven exhibits and the testimony of Gert K. A. Siggelin, vice president of A. B. Flaktfabriken, North and South American Region, who had been president of American SF Products, Inc., from September 1963 to April 1966. The latter is a wholly owned subsidiary of the former. Mr. Siggelin's duties as president of American SF Products, Inc., were in general management, including sales and engineering. He holds a degree in mechanical engineering from the Technical Institute in Stockholm, and since 1953 his efforts have been in the area of drying and air handling. He said he was familiar with the items herein and described them as spare parts for a Flakt Dryer, type L, which was sold to Georgia Pacific Company's plant in Samoa, California. He identified the parts enumerated on the invoice with the parts of a Flakt Dryer designated on drawings thereof (exhibits 2 and 3). Defendant has conceded that the imported items are or will be parts of a Flakt Dryer.

Mr. Siggelin had observed the Flakt Dryer in use at the Georgia Pacific plant and had seen the same type dryers in other areas of this country and abroad. He said it is used in the course of the process of making pulp available for sale. He had observed the pulp making process, by which he meant the transformation of fibers in a slurry solution to dry pulp in bales which can be shipped to a customer.

He explained that the process starts with a slurry solution of about 1 percent fiber and 99 percent water. The slurry flows from the head box on a wire which is a screen or a conveying screen where a substantial amount of water is drained off. A wet web or a fiber mat is formed on the screen. That mat goes through a first press, a second press, a predryer, and a third press before going into the Flakt Dryer. Water is removed continuously in the process except in the predryer, whose function is to increase the temperature of the pulp web. This changes the viscosity of the water and makes it easier to press it out in the third press. By the time the pulp web reaches the Flakt Dryer it consists of 40–45 percent fibers and 55–60 percent water and has a temperature of approximately 140 degrees Fahrenheit.

The wet pulp web enters the Flakt Dryer on the top and is carried through decks on cushions of air which are blown from the bottom, supporting the web and helping it forward in the direction of travel. Air is also blown down on the web from the top to dry it. The air is heated by means of steam coils to a temperature of 250–300 degrees Fahrenheit to speed up the drying. The web is treated or acted upon by the hot air which transmits heat to the pulp web and evaporates the moisture therein.

The machine has a roller at each end, but in between the web flows on air without touching the sides and being discolored by rubbing. The product that emerges is a dry sheet having the physical characteristics of commercial pulp. The sheet is then cut in pieces, pressed together in bales and shipped to customers.

Samples of the wet pulp web and of the finished commercial pulp were received in evidence as exhibits 6 and 7, respectively. The witness testified that the former was very wet and was hard to handle since it was weak and easily torn. He said that exhibit 7 was very strong and could actually break mechanical equipment. According to the witness, exhibit 6 would eventually dry out completely (as in fact it has) and would be the same as exhibit 7 in water content but would be cockled and have an uneven surface. Exhibit 7 is a comparatively smooth piece of board.

Plaintiff contends that the Flakt Dryer performs an essential step in the pulp making process and is a machine for making cellulosic pulp, within the meaning of item 668.00, supra. The parts are therefore claimed to be dutiable under item 668.06, as parts of machines for making cellulosic pulp.

Defendant's position is that the Flakt Dryer treats materials by a process in-

volving a change of temperature, such as heating, drying, and evaporating and that the parts thereof were properly classified under item 661.70, supra.

Under the Tariff Act of 1930, as modified, it has been held that no one machine makes paper pulp and that machines used in the process thereof (unless essentially electrical) are classifiable under paragraph 372, as modified, as machines for making paper or paper pulp. Bird Machine Company v. United States, 51 CCPA 42, C.A.D. 835; Superwood Corporation v. United States, 52 Cust.Ct. 92, C.D. 2443, affirmed sub nom. United States v. Superwood Corporation, 52 CCPA 57, C.A.D. 858; Arthur J. Fritz & Co. v. United States, 46 Cust.Ct. 215, C.D. 2258. In the case last cited the merchandise consisted of pulp drying equipment which apparently performed a function the same as or similar to that of the Flakt Dryer. The court stated (p. 221):

The evidence herein establishes that the imported machine in its operative condition, takes a pulp sheet or web, which has already been through a mechanical process to remove water, and, by means of thermal drying, removes water from the pulp sheet. The witness, Mr. Ahlen, testified that, prior to entering the involved drier, the pulp sheet may contain as much as 60 per centum water and, when it leaves the machine, after traversing its length nine times, may contain as little as 10 per centum water. The record also establishes that the final product from this machine is merely slit into sheets and baled as a completed product.

We are of the opinion that since all of the operations performed by the machine were prior to the completion of the manufacture of the pulpboard produced, the involved machine falls within the purview of paragraph 372 of the Tariff Act of 1930, as modified, supra, as machines for making paper or paper pulp, as claimed by plaintiff herein, since "pulpboard" is described in the Dictionary of Tariff Informa-

tion (1924), as "paper" nine one-thousandths of an inch in thickness. * *

The language of item 668.00 and item 668.06 is similar to that in the portion of paragraph 372 of the Tariff Act of 1930, as modified, which provides for "machines for making paper or paperpulp" and was derived in part therefrom. Tariff Classification Study, November 15, 1960, schedule 6, pages 266–267. It follows that the Flakt Dryer involved herein is a machine for making cellulosic pulp, paper, or paperboard within the meaning of item 668.00.

It also falls within the description in the superior heading to item 661.70 covering industrial machinery, plant, and similar laboratory equipment, for the treatment of materials by a process involving a change in temperature, such as heating, drying, evaporating, etc.

Plaintiff claims, however, that the Flakt Dryer does more than treat the pulp web by a temperature change process and that item 661.71 was not intended to cover machines, such as the Flakt Dryer, which manufacture materials into finished products. It quotes from the Tariff Classification Study, schedule 6, page 263, as follows:

* * * Item 661.70 covers industrial and laboratory equipment, whether or not electrically heated, for the treatment of materials by a process involving a change in temperature. This equipment is designed to submit materials to a heating or cooling process in order to cause the simple change of temperature, or to cause the transformation of materials resulting principally from the temperature change. The item does not cover equipment in which the heating or cooling, even if essential, is merely a secondary function designed to facilitate the main function. * * *

It is clear from the record that the heating done by the Flakt Dryer is not merely a secondary function designed to facilitate some other function, but that heating, drying, and evaporating are the principal, if not the only, functions of the machine. Whatever the Flakt Dryer

does, it does by means of heating and drying the pulp web and evaporating the water from it. The finished product, illustrated by exhibit 7, is in better form than exhibit 6, which dried naturally, but the machine did nothing to make that except by blowing hot air on it. The witness testified that there were rollers at each end of the machine, but that in between there was no mechanical thing which acted on the web, only the air itself. The rollers apparently were nothing more than feeders and did nothing to the form of the material.

In view of the fact that the Flakt Dryer is described by both item 661.70, which is in subpart A of part 4 of schedule 6, and item 668.00, which is in subpart D of said part and schedule, the headnote to subpart A comes into play. It provides:

1. A machine or appliance which is described in this subpart and also is described elsewhere in this part is classifiable in this subpart.

We have recently had occasion to consider the effect of this headnote. Amalgamated Sugar Company v. United States, 60 Cust.Ct., C.D. 3361. The merchandise in that case consisted of a rotary displacement magma pump and parts which were covered by item 660.-90, which provided for pumps for liquids, and item 666.20, which provided for machinery for use in the manufacture of sugar. Since the former was in subpart A and the latter in subpart C, it was held that the pumps were classifiable under the former. The court discussed the legislative history of the headnote and concluded:

The effect of the TSUS headnotes quoted above as applied to this case is that the subject importations are classifiable as pumps for liquids and parts thereof even if they were specially designed and chiefly used as machinery for the manufacture of sugar. * * *

The conclusion expressed in the preceding paragraph should not be construed as an application of the rule of relative specificity. Rather, the effect of the cited headnote to subpart A may be compared to the effect of phrases, contained in earlier tariff statutes, such as: "whether or not more specifically provided for elsewhere"; "by whatever name known"; or "whether or not provided for elsewhere." See e. g. Kayser & Co. (Inc.) v. United States, 13 Ct.Cust.Appls. 474, T.D. 41367; Western Cartridge Co., etc. v. E. I. duPont de Nemours & Co. (Inc.), etc., 16 Ct.Cust.Appls. 229, T.D. 42839; Madame Adele v. United States, 23 Ct.Cust.Appls. 305, T.D. 48176; Richard Crittall Radiant Heating Corp. v. United States, 27 Cust.Ct. 193, C.D. 1369; Swiss Manufactures Association, Inc., et al. v. United States, 39 Cust.Ct. 227, C.D. 1933. For, if an article is described in a subpart A tariff description, the headnote to subpart A eliminates relative specificity from consideration and requires that the article be assessed as there provided.

The headnote contains language of an "invading character", similar to the quoted phrases, indicating a congressional intent to give precedence in classification to an article described in subpart A. Accordingly, subpart A invades every other subpart of part 4 and removes therefrom articles described therein which also are described in subpart A. The subpart A headnote may be compared with the proviso to paragraph 1504 of the 1922 Act and paragraph 1604 of the 1930 Act which limited the inclusiveness of those paragraphs to articles not specified by name in the dutiable list. When a particular importation was so specified by name, it was not classifiable as an agricultural implement nor as sugar machinery even if exclusively used and specially designed for such restricted purposes. United States v. Sheepshearers Mdse. & Comm. Co., 20 Ct.Cust.Appls. 327, T.D. 46112; United States v. J. A. Freeman & Son, 29 CCPA 103, C.A.D. 177; Enrique Abarca and U. Casal et al. v.

United States, 18 Ct.Cust.Appls. 370, T.D. 44617.

The effect of the headnote to subpart A in the instant case is to cause the subpart A item, 661.70, to invade the subpart D item, 668.00, and remove therefrom the articles described therein which are also described in item 661.70. Thus, the merchandise involved herein must be classified under item 661.70, as industrial machinery and equipment for the treatment of materials by a process involving a change of temperature, even though it is also described in item 668.-06, as parts of machines for making cellulosic pulp, paper or paperboard.

For the reasons stated, the protest is overruled and judgment will be entered for the defendant.