**Slip Op. 04-143**

**United States Court of International Trade**

FAUS GROUP, INC.,

             Plaintiff,

      v.

UNITED STATES,

             Defendant.

Before: Pogue, Judge

Court No. 03-00313

[Cross-motions for summary judgment denied]

November 15, 2004

McKenna Long & Aldridge LLP (Peter Buck Feller, Daniel G. Jarcho, and Brett Ian Harris) for Plaintiff.

Peter D. Keisler, Assistant Attorney General, Barbara S. Williams, Attorney in Charge, International Trade Field Office, Amy M. Rubin, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Yelena Slepak, Attorney, Of Counsel, Office of Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection, for Defendant.

**OPINION**

**Pogue, Judge**: Plaintiff, Faus Group, Inc. ("Faus"), challenges the denial of its protest of the liquidation of its laminated flooring panels ("merchandise" or "flooring panels"). The United States Customs Service ("Customs" or "Government")[1] classified the

---

[1]Effective March 1, 2003, the United States Customs Service was renamed the United States Bureau of Customs and Border Protection. See Homeland Security Act of 2002, Pub. L. No. 107-296 § 1502, 2002 U.S.C.C.A.N. (116 Stat.) 2135, 2308; Reorganization Plan Modification for the Department of Homeland Security, H.R. Doc. No. 108-32, at 4 (2003).

merchandise under heading 4411 of the Harmonized Tariff Schedule of the of the United States ("HTSUS") (2001) which covers "[f]iberboard of wood or other ligneous materials, whether or not bonded with resins or other organic substances." Faus avers that its merchandise should be classified under heading 4418, HTSUS, as "[b]uilders' joinery and carpentry of wood, including cellular wood panels and assembled parquet panels; shingles and shakes." Before the Court are cross-motions for summary judgment pursuant to USCIT Rule 56. The Court has exclusive jurisdiction over this case under 28 U.S.C. § 1581(a)(2000). Because the Court finds that Customs properly classified the merchandise under heading 4411, HTSUS, but the proper subheading cannot be determined, both parties' motions for summary judgment are denied.

## UNDISPUTED FACTS

Faus is an importer of laminated flooring panels manufactured from its parent, Industrias Auxiliares Faus S.L., in Spain. Decl. Juan B. Flores ("Flores Decl.") at para. 3 (Mar. 23, 2004).[2] The flooring panels are made with a core of fiberboard with a density of between 0.85-.95 g/cm$^3$. Id. at para. 5. Across the width of the

---

[2]The Government accepts Faus' factual assertions as true for the purposes of the cross-motions of summary judgment, see Def.'s Mem. Supp. Cross-Mot. Summ. J. & Opp'n Pl.'s Mot. Summ. J. ("Def.'s Mem.") at 9, except insofar as to whether Faus' faux flooring is water resistant, see Def.'s Resp. Pl.'s Statement Material Facts at paras. 9-10.

panels a color photograph of three parallel wood strips is overlayed, with the ends of the parallel strips offset from each other. Id. at para. 7, Product Sample, Pl.'s Ex. 1. The overlay is embossed to further simulate the appearance of a natural wood product.[3] Flores Decl. at para. 5. The fiberboard core is backed by a reinforced melamine layer. Id. The panels are non-structural finished articles ready for installation by end-users. Id. at para. 10. Eight panels are packaged together, id. at para. 24, and each panel is tongue-and-grooved along all of it edges and ends such that it can be joined with other boards and permanently affixed with the aid of adhesives, id. at para. 11. Overall, the product is designed to have a "look, price and performance comparable to traditional wood flooring." Id. at para. 9.

## SUMMARY OF PARTIES' ARGUMENTS

Faus argues that the imported laminated flooring panels in question should be classified under heading 4418, HTSUS, covering "[b]uilders' joinery and carpentry of wood, including cellular wood panels and assembled parquet panels; shingles and shakes."[4] Pl.'s

---

[3]Because the Court rejects Plaintiff's contention that the merchandise is properly classified in heading 4418, HTSUS, it has no occasion to consider whether Faus' product simulates parquet flooring, and whether simulation of parquet flooring alone is sufficient to classify a product as parquet panels under subheading 4418.30, HTSUS.

[4]4418.00          Builders' joinery and carpentry of wood,
                         including cellular wood panels and

Mem. Supp. Mot. Summ. J. at 7-24 ("Pl.'s Mem."), Pl.'s Reply Supp.

Mot. Summ. J. ("Pl.'s Reply") at 1-5.  Faus contends that the

subject merchandises is properly classifiable under heading 4418,

HTSUS, because builders' joinery, a term adopted from the Brussels

Nomenclature, covers flooring panels prepared with joints for

assembly.  Pl.'s Mem. at 9-12, Pl.'s Reply at 1.  Moreover, it

asserts that the plain language of heading 4418, HTSUS, and the

Explanatory Notes confirm this conclusion.  Pl.'s Mem. at 13-14,

Pl.'s Reply at 1-2.[5]  Faus denies that the flooring panels can be

| | | assembled parquet panels; shingles and shakes |
|---|---|---|
| 4418.10 | | Windows, French-windows and their frames: |
| 4418.20 | | Doors and their frames and thresholds: |
| * | * | * |
| 4418.30.00 | | Parquet panels |
| * | * | * |
| 4418.90 | | Other: |

[5]Since January 1, 1989, products entering the United States
are  classified according to the Harmonized Tariff Schedule of
the United States.  Omnibus Trade and Competitiveness Act of
1988, Pub. L. No. 100-418, § 1217, 102 Stat. 1107, 1163 (1988);
see 19 U.S.C. § 3001 (1988).  The HTSUS is the United States'
implementation of the International Convention on the Harmonized
Commodity Description and Coding System ("Convention"), 102 Stat.
1107, 1147, which was the culmination of a ten-year effort by the
United States and its major trading partners to develop "a single
modern product nomenclature for international use as a standard
system of classifying goods for customs."  Booklet 18 (§ 50.2
Classification of Merch.), 2 Commentary, Customs Law & Admin.
(3rd ed. 2004) at 5.  Part of this effort required the

classified under heading 4411, HTSUS, which covers "[f]iberboard of

wood or other ligneous materials, whether or not bonded with resins

or other organic substances,"[6] because Note 4 to Chapter 44 provides

_____

reconciliation of the Tariff Schedule of the United States,  and
the Brussels Nomenclature, a common nomenclature adopted by
European nations in the 1950s, which were two major influences on
the Convention. See Customs Co-Operation Council, Introducing the
International Convention on the Harmonized Commodity Description
and Coding System 13, 19-20(1987).
     To oversee the implementation of the harmonized system, the
Convention empowered the Customs Cooperation Council ("CCC"),
renamed the World Customs Organization ("WCO") in 1994, to
publish explanatory notes "constitut[ing] the official
interpretation of the Harmonized System at the International
level," id. at 36, and to recommend amendments to the
nomenclature, Convention Article 16 found at
http://www.wcoomd.org/ie/En/Conventions/conventions.html.  The
Explanatory Notes published by the World Customs Organization are
amended regularly to help resolve questions as to the proper
classification of goods.


[6]4411              Fiberboard of wood or other ligneous
                     materials, whether or not bonded with resins
                     or other organic substances:
                          Fiberboard of a density
                          exceeding 0.8 g/cm$^3$:
     4411.11.00                 Not mechanically worked
                                or surface covered

          *         *         *

     4411.19                              Other:
     4411.19.20                           Not surface covered (except
                                          for oil treatment)

          *         *         *

                                          Other:
     4411.19.30                                Tileboard which has been
                                               continuously worked along
                                               any of its edges and is
                                               dedicated for use in the
                                               construction of walls,
                                               ceilings or other parts

that "[p]roducts of heading 4410, 4411 or 4412 may be worked to form the shapes provided for in respect of the articles of heading 4409 [which includes tonguing and grooving] . . . or submitted to any other operation provided it does not give them the character of articles of other headings."  Pl.'s Mem. at 24-27, Pl.'s Reply at 5-8.  Faus claims that because its merchandise has been tongue-and-grooved and surface coated, and these operations give the merchandise the character of builders' joinery, the merchandise cannot be classified under heading 4411, HTSUS.  See Id.  Last, Faus asserts that even if the merchandise is classified under heading 4411, HTSUS, it should be classified under subheading 4411.19.30, HTSUS, which covers "[t]ileboard which has been continuously worked along any of its edges and is dedicated for use in the construction of wall, ceilings or other parts of buildings."[7]  Pl.'s Mem. at 27 n.12.

The Government avers that the merchandise is not classifiable under heading 4418, HTSUS, because heading 4418, HTSUS, covers only products specifically mentioned in the heading and other builders' products not covered by other tariff provisions.  Def.'s Mem. at 17-

---

                                              of buildings

4411.19.40                          Other

---

[7]Faus and the Government also dispute the proper subheading under heading 4418, HTSUS.  Because the Court rejects Faus' arguments that the merchandise is properly classifiable under heading 4418, HTSUS, the Court will not summarize those arguments.

19, Def.'s Reply Pl.'s Resp. Def.'s Cross-Mot. Summ. J. at 4-5 ("Def.'s Reply"), Def.'s Resp. Ct.'s Questions Prior Oral Argument Parties' Cross-Mot. Summ. J. at 2-3 ("Def.'s Resp."). The Government claims that Faus' reading of heading 4418, HTSUS, creates conflicts with other headings. Id. Moreover, the Government asserts that an interpretation of heading 4418, HTSUS, by a Canadian customs tribunal supports its reading. Def.'s Mem. at 23 n.12.

The Government further asserts that even if the merchandise can be classified under heading 4418, HTSUS, heading 4411, HTSUS, is the more specific and accurate heading for the merchandise. Def.'s Mem. at 29-30. The Government challenges Faus' interpretation of Note 4 to Chapter 44, asserting that the language, "[p]roducts of heading 4410, 4411 or 4412 may be worked to form the shapes provided for in respect of the articles of heading 4409 [which includes tonguing and grooving] . . . or submitted to any other operation provided it does not give them the character of articles of other headings" supports the classification of the merchandise under heading 4411, HTSUS. Id. at 9-16, Def.'s Reply at 9-12. More specifically, the Government claims that Faus misconstrues the antecedent to the word "it," which only refers to "any other operation." Def.'s Mem. at 11-12. Therefore, the Government argues, when properly construed, Note 4 indicates that products may be tongue-and-grooved and still remain in heading 4411, HTSUS. Id. Last, the Government argues that the merchandise is not tileboard and therefore should be classified under subheading

4411.19.40, HTSUS, the basket provision for "[f]iberboard of a density exceeding 0.8 g/cm$^3$." Def.'s Mem. at 2.


**STANDARD OF REVIEW**

"The proper scope and meaning of a tariff classification term is a question of law . . . while determining whether the goods at issue fall within a particular tariff term as properly construed is a question of fact." Franklin v. United States, 289 F.3d 753, 757 (Fed. Cir. 2002) (citations omitted). A Customs classification ruling is subject to de novo review as to the meaning of the tariff provision but may be accorded a "respect proportional to its 'power to persuade.'" United States v. Mead, 533 U.S. 218, 235 (2001) (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).

Both parties have moved for summary judgment pursuant to USCIT Rule 56. Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." USCIT R. 56(c) (emphases added). Material issues only arise concerning "facts that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Consequently, in classification cases, genuine issues of material fact only arise when there is a dispute over the use, characteristics, or properties of the merchandise being classified, Brother Int'l Corp. v. United

States, 26 CIT ___, ___, 248 F. Supp. 2d 1224, 1226 (2002), or where commercial meaning is in question. Russell Stadelman & Co. v. United States, 242 F.3d 1044, 1048 (Fed. Cir. 2001). For the reasons set forth below, summary judgment for either party at this point is not warranted.

## DISCUSSION

"The proper classification of merchandise entering the United States is directed by the General Rules of Interpretation ('GRIs') of the HTSUS and the Additional United States Rules of Interpretation." Orlando Food Corp. v. United States, 140 F.3d 1437, 1439 (Fed. Cir. 1998). According to the GRIs, a Court must choose the most appropriate heading and then, "[o]nly after determining that a product is classifiable under the heading should the court look to the subheadings to find the correct classification for the merchandise." Id. at 1440 (citing GRI 1, 6, HTSUS). As it is possible that goods may be, "prima facie, classifiable under two or more headings," GRI 3, HTSUS, provides additional guidance in choosing between the relevant headings. According to this framework, the Court must first determine the proper heading for the flooring panels.

In this case, the parties have submitted two possible headings under which the merchandise may fall: headings 4411, HTSUS and 4418, HTSUS. Because the applicability of heading 4411, HTSUS, is dependent on the meaning of heading 4418, HTSUS, by virtue of Note

4 to Chapter 44, the Court will first construe heading 4418, HTSUS, and then heading 4411, HTSUS. Because the Court finds that the flooring panels appear to be <u>prima facie</u> classifiable under both headings, the Court will next determine which of the two headings is the proper heading for the merchandise. After concluding that heading 4411, HTSUS, is the proper heading for Faus' merchandise, the Court will consider whether Faus' merchandise is "tileboard," ultimately concluding that there are still triable issues precluding summary judgment.

## I. Choosing the Proper Heading

**A. Heading 4418, HTSUS**

The Court first looks to the language of heading 4418, HTSUS. When classifying merchandise, "HTSUS terms are to be construed according to their common and commercial meanings, which are presumed to be the same." <u>Carl Zeiss, Inc. v. United States</u>, 195 F.3d 1375, 1379 (Fed. Cir. 1999). The Court may only set aside the common meanings when so directed by the legislative history,[8] where a party proves that a term "has a different commercial meaning that is definite, uniform, and general throughout the trade," <u>see</u> <u>id.</u> at

---

[8]Neither the parties, nor the Court, have found any Congressional history on heading 4418, HTSUS. Builders' joinery was not part of the Tariff Schedule of the United States and was inserted into the United States nomenclature as part of the United States' adoption of the Harmonized Tariff Schedule.

1379,[9] or where application of the common meaning would produce absurd or anomalous results, <u>Pillowtex Corp. v. United States</u>, 21 CIT 1154, 1157, 983 F. Supp. 188, 191 (1997).

Heading 4418, HTSUS, covers "[b]uilders' joinery and carpentry of wood, including cellular wood panels and assembled parquet panels; shingles and shakes."  Heading 4418, HTSUS.  Although the merchandise is made of fiberboard, not wood, Note 3 to Chapter 44 specifies that heading 4418, HTSUS, applies to "articles of the respective descriptions of particle board or similar board, <u>fiberboard</u>, laminated wood or densified wood as they apply to such articles of wood." (Emphasis added).  Both parties agree that the merchandise comprises neither carpentry of wood[10] nor shingles or shakes.[11]  Therefore, if the merchandise is to fall within heading

---

[9]There appears to be no commercial meaning for the terms in heading 4418, HTSUS.  Dep. of Paul Garretto, Pl.'s Ex. 4 at 113 ("The industry in the United States does not use [the] term [builders' joinery].").

[10]According to the Explanatory Notes, carpentry of wood involves woodwork "used for structural purposes or in scaffoldings, arch supports . . . ." Harmonized Commodity Description and Coding System Explanatory Note 44.18 at 686-87 (2nd ed. 1996) ("Explanatory Notes").  As Faus has agreed that its flooring panels are non-structural, <u>see</u> Flores Decl. at para. 10,  the merchandise cannot constitute carpentry of wood.  The Explanatory Notes "do not constitute controlling legislative history but nonetheless are intended to clarify the scope of [the] HTSUS [] and to offer guidance" in its interpretation, <u>Mita Copystar America v. United States</u>, 21 F.3d 1079, 1082 (1994).

[11]Shingles are a "[r]oofing material made from wood or other material" and shakes are a "[r]oofing material produced from wood." <u>Terms of the Trade</u>, <u>supra</u> at 297 & 299 (4th ed. 2000).  There is no evidence in the record that the flooring panels are used on roofs.

4418, HTSUS, it must be "builders' joinery."


     i. Choosing the proper term:

Both parties have argued, albeit in different ways, that "builders' joinery" is a term of art.  A "term of art" is a "word or phrase having a specific, precise meaning in a given specialty, apart from its general meaning in ordinary contexts."  Black's Law Dictionary 1511 (8th ed. 2004).  Consequently, if "builders' joinery" is a term of art, neither searching through dictionaries for the words "builders" and "joinery" may be appropriate nor may definitions provided by common sources be applicable.  In considering this question, the Court is mindful that terms of art are generally disfavored.  See, e.g., Lynch v. Alworth-Stephens Co., 267 U.S. 364, 370 (1920) ("'[T]he plain . . . meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover.'") (quoting Lynch v. Alworth-Stephens Co., 294 Fed. 194 (8th Cir. 1923), Campbell v. Merit Sys. Protection Bd., 27 F.3d 1560, 1567 (Fed. Cir. 1994), Amity Leather Co. v. United States, 20 CIT 1049, 1053-54, 939 F. Supp. 891, 895 (1996); cf. Carl Zeiss, 195 F.3d at 1379 (a party must prove "that [a term] has a different commercial meaning that is definite, uniform, and general throughout the trade"). Additionally, in evaluating this question, the Court notes that the Explanatory Notes refer to the term as just "joinery," see EN 44.18,

the heading in the Brussels Nomenclature was "[b]uilders' carpentry and joinery," see Pl.'s Mem. at 9, and that there are no dictionary or other definitions of "builders' joinery" as a single term.

Faus argues that "builders' joinery" was a term employed by the Brussels Nomenclature and incorporated into the United States nomenclature upon the adoption of the HTSUS. Pl.'s Mem. at 10-12. Therefore, when heading 4418, HTSUS, was incorporated into the HTSUS, it was incorporated as understood under the Brussels Nomenclature. Id. at 10-11 (citing Felix Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 537 (1947)). Accordingly, Faus argues that the Court should interpret the provision as it was understood under the Brussels Nomenclature.[12] Id. at 11-12. However, Faus fails to point to any definition of these terms as understood under the Brussels Nomenclature that offers any more understanding than the Court has with the current text and Explanatory Notes.[13] Cf. Lonza Inc. v. United States, 46 F.3d 1098, 1106 (Fed. Cir. 1995) ("Absent an express definition, however, the court may consult dictionaries,

_____

[12]The Convention requires that each contracting nation "use all the headings and subheadings" adopted, Convention at Article 3(1)(i), but may create "subdivisions classifying goods beyond the level of the Harmonized System." Id. Convention at Article 3(3). For example, in this case, the heading 4411, and subheading 4411.11, HTSUS, for fiberboard with densities over $0.8$ g/cm$^3$, are set at the international level, whereas the sub-subheading 4411.19.30, HTSUS, covering tileboard, is a purely domestic creation specific to the United States tariff schedule.

[13]Faus cites to both the Brussels Nomenclature heading 44.23 and the accompanying Explanatory Notes. Pl.'s Mem. at 9-12.

lexicons, scientific authorities, and other such reliable sources in its effort to determine common meaning."). Nor has Faus submitted any evidence that the term obtained a special meaning different than the one employed by common sources.

Alternatively, the Government argues that "builders' joinery," as used in heading 4418, HTSUS, is a term of art that has a meaning specific to the HTSUS. See, e.g., Def.'s Resp. at 2 ("Although, as noted, we do not dispute the definition provided by the Court is appropriate for general purposes, we do not agree that this broad interpretation properly construes the tariff term 'builders' joinery,' which appears only in Heading 4418.") (emphasis in orginal). The Court does not dispute that a common meaning may be colored by the context in which the word is used. However, there is a distinction between coloring the meaning of a word and creating a new definition of a term specific to the HTSUS which bears little resemblance to the terms in the heading.[14] If a tariff term were to

---

[14]At oral argument, the Government maintained that its argument was not a "term of art" argument, rather an argument based on the principle of in pari materia. The Government correctly notes that words do gather meaning from context. Accordingly, "[w]here a tariff term has various definitions or meanings and has broad and narrow interpretations, the court must determine which definition best invokes the legislative intent." Marubeni Am. Corp. v. United States, 19 CIT 1249, 1253, 905 F. Supp. 1101, 1105 (1995) (emphasis added). However, as the Government admits, it "did not offer any alternative definitions of the general term 'builders' joinery.'" Def.'s Resp. at 1. Consequently, the Government has provided no definition of builders' joinery to prefer without adding language to the HTSUS; the principle of in pari materia does not grant a court license to add language to a heading, only to prefer a definition or meaning already existing. Cf. Church of the Holy Trinity v. United States, 143 U.S. 457 (1892) (exceptions can be read into

have a specific definition that bears little resemblance to the common meaning of the tariff term, the WCO or Congress most likely would have included a definition in the HTSUS or the U.S. Additional Notes. <u>Cf.</u> Chapter 44, Note 2, HTSUS (defining "densified wood"); Chapter 44, U.S. Note 1(a), HTSUS (defining "wood waste"); Chapter 44, U.S. Note 1(b), HTSUS (defining "standard wood molding"); Chapter 44, U.S. Note 1(c), HTSUS (defining "surface covered"). Likewise, the Explanatory Notes' description of "joinery" in no way supports the Government's proffered definition. <u>See</u> EN 44.18 and <u>infra</u> at 19-20. Accordingly, there is no reason to believe that "builders' joinery," as used in the tariff schedule, has a different meaning than the meaning used in common parlance. Therefore, the Court will define the language "builders' joinery" according to the

---

unambiguous statutory language only where absurd results would occur otherwise and as a last resort). For example, if the Government wanted to limit builders' joinery by the type of allowable joint, <u>see</u> <u>infra</u> at 25-27, or wanted to read in a limitation by virtue of the "including cellular wood panels and assembled parquet panels" clause, the Court would have a textual hook to justify the Government's assertions. (The "including . . . assembled parquet panels" language appears to be addressing itself to heading 4409, HTSUS, which covers "[w]ood (including strips and friezes for parquet flooring, not assembled)," and does not necessarily have direct ramifications for heading 4411, HTSUS; cellular wood panels appear to be classifiable in multiple headings, <u>see</u> Headquarters Ruling ("HQ") 964683 (August 5, 2002), rendering the "including" language important in simplifying the classification of cellular wood panels.) However, the Government has adopted the position that heading 4418, HTSUS, includes "only the products expressly identified in Heading 4418 and builders' products that are either not described in other provisions or that have undergone operations beyond those provided for in other provisions." Def.'s Mem. at 17. This is not a definition but a result and a result not imputable to the words "builders' joinery." The Court uses definitions to arrive at the right result, not vice versa.

definitions of its two composite words, "builders'" and "joinery."

          ii. Defining builders' joinery:

Starting with the word "builders'," dictionaries generally define a "builder" as one who constructs a building. See II Oxford English Dictionary 631 (2nd ed. 1989) ("[o]ne who builds; the erector of a building." ); Webster's II New Riverside University Dictionary 206 (1988) ("[o]ne that builds, esp. a person who contracts for and supervises the construction of a building"); American Heritage Dictionary 250 (3rd ed. 1992) (same); J. Stewart Stein, Construction Glossary 803 (2nd ed. 1993)("Individual, company, or corporation who engage [sic] in building construction"); but cf. Webster's Third New International Dictionary 292 (1993) ("one that builds: as . . . a worker (as a carpenter, shipwright, or mason) whose occupation is to build.").[15]  Because "builders'" is an adjective that modifies "joinery," and builders are involved in the construction of buildings, the addition of the word "builders'" alerts the reader that only those definitions relating to the construction of buildings are relevant.  Therefore, the Court deems only definitions of "joinery" involving the construction of buildings relevant and discards those that do not involve the

---

[15]Given that the definitions, other than Webster's, only include buildings rather than boats or ships, and because the products in this case are clearly for building use, the definitions of the other dictionaries is preferred here.

construction of buildings.

Definitions of "joinery" vary slightly more, and are less precise, than the definitions of "builder." The <u>Dictionary of Architecture and Construction</u> defines joinery as "[t]he craft of woodworking by joining pieces of wood, esp. of the finish and trim workings of the interior of a structure, such as doors, paneling, sashes, etc., as distinguished from <u>carpentry</u>, which suggests framing and rough work." <u>Dictionary of Architecture & Construction</u> 519 (3rd ed. 2000) (emphasis in original). The <u>Columbia Encyclopedia</u> similarly defines joinery as the "craft of assembling exposed woodwork in the interiors of buildings." <u>The Columbia Encyclopedia</u> (6th ed. 2001) <u>available</u> at http://www. bartleby.com/65/ jo/joinery.html. <u>Webster's Third New International Dictionary</u> defines "joinery" "as the art or trade of a joiner" where a "joiner" is defined as "a person whose occupation is to construct articles by joining pieces of wood: one who does the woodwork (as doors or stairs) necessary for the finishing of buildings." <u>Webster's Third</u>, <u>supra</u> at 1219. The <u>Oxford English Dictionary</u> defines "joinery" as "[t]he art or occupation of a joiner, the construction of wooden furniture, fittings, etc. . . ." wherein "joiner" is defined as "[a] craftsman whose occupation it is to construct things by joining pieces of wood; a worker in wood who does lighter and more ornamental work than that of a <u>carpenter</u>, as the construction of the furniture and fittings of a house, ship,

etc." VIII <u>Oxford English Dictionary</u>, at 262 (emphasis in orginal).

The <u>American Heritage Dictionary</u> defines "joinery" as "1. The art

or craft of a joiner: cabinetmaking. 2. work done by a joiner; fine

woodwork" where "joiner" is "[a] carpenter, especially a

cabinetmaker." <u>American Heritage</u>, <u>supra</u> at 971. The <u>Terms of the</u>

<u>Trade</u> defines "joinery" as, "1. A term used in Europe to denote the

higher grades of lumber suitable for such uses as cabinetry,

millwork, or interior trim. 2. The products made by a joiner,"

<u>Terms of the Trade</u> 186 (4th ed. 2000).

> Finally, the Explanatory Note for 44.18 states that:
>
> This heading applies to [1] woodwork, including that of
> wood marquetry or inlaid wood, [2] used in the
> construction of any kind of building, etc., [3] in the
> form of assembled goods or as recognisable unassembled
> pieces (e.g., prepared with tenons, mortises, dovetails
> or other similar joints for assembly), whether or not
> with their metal fittings such as hinges, locks, etc.

EN 44.18 at 686. The Explanatory Note further comments that joinery

"applies more particularly to builders' fittings[16] (such as doors,

windows, shutters, stairs, door or window frames)." <u>Id.</u> The

Explanatory Notes are especially helpful in this context because the

United States adopted the Customs Cooperation Council's language for

heading 4418, HTSUS. <u>Cf</u>. <u>Pima Western, Inc. v. United States</u>, 20

CIT 110, 113, 915 F. Supp. 399, 402 (1996) ("Where the United States

has adopted headings, subheadings, and related chapter notes

---

[16]Fittings are "furnishings or fixtures." <u>American Heritage</u>,
<u>supra</u> at 688.

verbatim from the CCC's version, the CCC's Explanatory Notes are especially helpful in interpreting the HTSUS, albeit not dispositive.").

From these definitions a general pattern emerges that "builders' joinery" relates to: a) already joined pieces of wood or wood products capable of being joined with joints; b) that the products function as non-structural elements of a building; and c) that the wood is used as woodworking, i.e., finishing, for the interior of a building.[17]

### iii. The Government's Proposed Construction:

The Government does not offer the Court a definition of builders' joinery.  See Def.'s Mem. at 16-23, Def.'s Reply at 4-13.[18]  Nor does it "dispute [that] the definition provided by the

---

[17]Faus cites to Am. Bayridge Corp. v. United States, 22 CIT 1129, 1142, 35 F. Supp. 2d 922, 932 (1998) to support its definition of builders' joinery, noting that it  was "vacated on other grounds."  Pl.'s Mem. at 16.  That case was appealed and the Federal Circuit "vacate[d] that portion of the Court of International Trade's judgment that relates to the classification of predrilled studs." American Bayridge Corp. v. United States, 21 I.T.R.D. (BNA) 1766, 1767 (Fed. Cir. 1999) (unpublished decision); see also 217 F.3d 857 (Fed. Cir. 1999)).  Because the classification portion of the decision was vacated, reliance or citation thereto is precluded.

[18]The Government also argues that the instant case is controlled by the Federal Circuit's decision in Boen Hardwood Flooring, Inc. v. United States, 357 F.3d 1262 (Fed. Cir. 2004). Def.'s Mem. at 15.  The Government claims that "[g]iven the similarity between the Boen merchandise and Faus's merchandise, this Court should follow the CAFC and classify Faus's flooring panels in the materials provision, in this case, the 'fiberboard

Court is appropriate for general purposes; [however the Government does] not agree that this broad interpretation properly construes the tariff term 'builders' joinery,' which appears only in Heading 4418." See, e.g., Def.'s Resp. at 2. Instead, the Government proposes an alternative reading of "builders' joinery" which covers "[1] only the products expressly identified in Heading 4418 and [2] builders' products that are either not described in other provisions or [3] that have undergone operations beyond those provided for in other provisions." Def.'s Mem. at 17. To support its argument, the Government asserts that if the Court uses the common meaning, heading 4418, HTSUS, then heading 4418, HTSUS, will subsume or conflict with other headings, thereby rendering them superfluous or impermissibly redundant. Id. at 17-18.[19]

_____

provision.'" Def.'s Mem. at 15. However, Boen dealt with the classification of certain plywood panels under heading 4412, HTSUS. The Federal Circuit did not discuss heading 4418, HTSUS, and the issue was not briefed to this Court. Given that small nuances in language can have dramatic impacts on classifying goods, cf. the discussion below of the word "it," it is unknowable whether, and to what extent, that decision has implications for this case. However, the Court does note that the Explanatory Note for 44.18 states that "plywood panels, even if surface treated for the purposes of concrete shuttering, are classified in heading 44.12," and goes on to state that "[t]he heading does not cover: (a) plywood panels or veneered panels, used as flooring panels, which have a thin veneer of wood affixed to the surface, so as to simulate a flooring panel made up of parquet strips . . . ." Explanatory Note 44.18 at 686. There is no similar exclusionary language for fiberboard products.

[19]Nor could the Government argue that builders' joinery includes only those products contained in the Heading and Explanatory Notes. The Explanatory Note reads, in part, "'joinery' applies more particularly to builders' fittings (such

The Government's proposed reading of "builders' joinery" is unpersuasive for three reasons.  First, what the Government means by "not described in other sections" is uncertain and unworkable.  If construed broadly, it means that only cellular wood panels, assembled wood panels, and builders' products not covered by other headings are classifiable under heading 4418, HTSUS.  However, Chapter 44 contains a basket provision for "[o]ther articles of wood."  Heading 4421, HTSUS; cf. Def.'s Mem. at 18 (claiming that shutters cannot be classifiable under heading 4418, HTSUS, because they are classifiable under heading 4421, HTSUS).  Therefore, all wood products are covered by other headings in Chapter 44 (and other chapters).  Consequently, there would be nothing left to commit to heading 4418, HTSUS.  On the other hand, if "not described in other sections" is meant only to cover those products not specifically named in other provisions, the Government could not prevail here because it seeks to classify Faus' merchandise in a basket provision under subheading 4411.19.40, HTSUS.  In other words, Faus' merchandise is "not described in other sections" and therefore would fall under heading 4418, HTSUS, under the Government's own proposed

as doors, windows . . . ." EN 44.18 at 686 (Emphasis added).  The words "such as" clearly state that this is a non-exhaustive list. Cf. Park B. Smith, Ltd v. United States, 347 F.3d 922, 928 (Fed. Cir. 2003) (rejecting a similar argument when the text employed the phrase "for example" which is "illustrative and informative, but not limiting.").  By not listing every possible product that may fall within the term builders' joinery, or including a catch-all, the drafters did not intend that builders' joinery be a special term of art as defined only in the Explanatory Notes.

construction.  Likewise, the second prong of the Government's proposed reading is problematic.  As will be discussed below, what falls within headings 4410, 4411 and 4412, HTSUS, is dependent on the "character of articles of other headings."  Chapter 44 Note 4, HTSUS.  Because "builders' joinery" would lack any "character" under the Government's reading, Note 4 would could not be triggered, rendering all products classifiable according to their input materials under headings 4410, 4411 and 4412, HTSUS.

Second, in an effort to avoid conflicts with other provisions, the Government completely ignores the words actually appearing in heading 4418, HTSUS.  The Government's proposed definition essentially seeks to convert "builders' joinery" into "builders' other."  This reading is made unlikely by the presence of a basket provision in Chapter 44, i.e., heading 4421, HTSUS.  What this suggests is that if the drafters wanted to make heading 4418, HTSUS, a basket provision for builders' products, they knew how to do so without using obscure terms like "builders' joinery."  Cf. Sosa v. Alvarez-Machain, 124 S. Ct. 2739, 2754 n.9 (2004) ("when it is clear that Congress knew how to specify [a term, i.e., "other"] when it wanted to, [the government's argument] runs afoul of the usual rule that 'when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.'") (citing 2A N. Singer, Statute and Statutory Construction § 46:06 at 194 (6th ed. 2000)).

Third, contrary to the Government's concern, the Court's
reading will not render other provisions nugatory because there are
limiting principles in the definition of "builders' joinery." <u>Cf</u>.
<u>Len-Ron Mfg. Co. v. United States</u>, 334 F.3d 1304, 1311 (Fed. Cir.
2003). For example, the Government is concerned that "decking" would
be included within 4418, HTSUS, rather than under headings 4407 and
4409, HTSUS. Def.'s Mem. at 18.[20]  However, because the definition
derived by the Court requires use for interior woodwork or fittings
of a non-structural nature, wood intended for decking would not fall

---

[20]The Court also notes that "decking" is not explicitly, or
implicitly, mentioned in 4407, HTSUS, or 4409, HTSUS, so there
appears no reason why decking must necessarily be classified
there.  The Government also cites other examples, i.e., worked
plywood and veneered panels (heading 4412), shutters (heading
4421), kitchen cabinets (heading 9403), wood molding (heading
4409), coniferous wood (heading 4409) and nonconiferous wood
flooring (heading 4409),  Def.'s Mem. at 18, Def.'s Reply at 9,
and has urged the Court to reconcile these provisions with the
proposed definition of heading 4418, HTSUS,  Def.'s Resp. at 2-
3. Worked plywood and veneered panels are explicitly excepted
from heading 4418, HTSUS, according to the Explanatory Notes.
<u>See</u> <u>infra</u> note 21.  Some shutters are used on the exterior of
buildings, thereby precluding them from being used on the
interior of buildings as required by the Court's definition;
moreover, shutters are given as a specific example of builders'
joinery by the Explanatory Notes.  EN 44.18 at 686.  Kitchen
cabinets are not mentioned <u>eo nomine</u> under heading 9403, HTSUS,
but in the non-binding statistical suffixes.  <u>See</u> <u>Pillowtex Corp.
v. United States</u>, 21 CIT 1154, 1157, 983 F. Supp. 188, 191 (1997)
("statistical suffixes are not part of the legally binding,
statutory language of HTSUS. Therefore, the inclusion of [the
merchandise in controversy] in the statistical suffix to HTSUS
9404.90.80 is irrelevant.") (citing <u>Pima Western, Inc. v. United
States</u>, 20 CIT 110, 115, 915 F. Supp. 399, 404 (1996)).
Moreover, these products, as well as the others, may not be
classified under heading 4418, HTSUS, because other headings may
be more specific to the particular good. <u>See</u> <u>infra</u> at 46-52.

under heading 4418, HTSUS. Similarly, the Government expresses concern over the classification of "tileboard" which is currently classifiable under subheading 4411.19.30, HTSUS. Id. The definition of builders' joinery requires that products be joined or capable of being joined together with the aid of joints. However, the only form of "tileboard" the Government recognizes has bull-nosed edges,[21] which prevent the joining together of tileboard panels, thereby excluding them from 4418, HTSUS.[22]

Alternatively, the solution may lie in the very nature of the problem itself. Under GRI 3, products are classified under the more specific heading. Accordingly, the more broad a provision is, the less likely it will be the more specific provision. There is no reason why the drafters would not have preferred this solution to cure any defect of heading 4418's, HTSUS, broad scope. Cf. Intercontinental Marble Corp. v. United States, 381 F.3d 1169, 1176 (Fed. Cir. 2004). In sum, the Government has offered no sufficient justification to re-write the plain language of the heading.

---

[21]See Terms of the Trade, supra at 47 ("bullnose" means "[t]he process of rounding an edge of a board used as shelving, stadium seating, stepping, etc.").

[22]For instance, JJ Barker's Tileboard product discussed in HQ 960084 as the model for defining "tileboard," has bull-nosed edges which make it incapable of being joined with like products. In fact, installation requires leaving an 1/8" gap between panels for the 100% silicone seams. See Installation, http://www.barker.ca/?section=barkertile&sub=Installation; see also HQ 085913 (January 8, 1990) (discussing Plywood Panels Inc.'s "tileboard").

iv. Nature of the Joints:

Alternatively, the definition of "builders' joinery" may be limited by the type of joints it includes, e.g., that tongue-and-grooved joints may be distinguishable from the types of joints listed as exemplars in the Explanatory Notes. See Def.'s Mem. at 23 n. 12; see also HFI Hardwood Flooring Inc. v. Deputy Minister of National Revenue, Appeal No. AP-94-188 (July 17, 1995), Ex. B to Def.'s Mem.[23] The Government argues that because tongue-and-grooved joints are included in heading 4409, HTSUS,[24] tongue-and-grooved joints cannot be included within meaning of heading 4418, HTSUS. Id.[25] First, if tongue-and-grooved joints did not meet the

---

[23]The Canadian Trade Tribunal found that "builders' joinery" had a commercial meaning within Canadian commerce. Because commercial designations must be established for commerce in the United States, where no proof has been offered to support a commercial designation within the United States, the Court is bound by the common meaning of the tariff term. Russell Stadelman & Co. v. United States, 242 F.3d 1044, 1049 (Fed. Cir. 2001) ("in considering the commercial designation of a tariff term, only commercial use of that term in the United States is relevant.").

[24]Heading 4409, HTSUS, reads: "Wood (including strips and friezes for parquet flooring, not assembled) continuously shaped (tongued, grooved, rebated, chamfered, V-jointed, beaded, molded, rounded or the like) along any of its edges, or faces, whether or not planed, sanded or finger-jointed." The 2002 Amendment added the words "and ends" after "edges", and replaced "finger-jointed" with "edge-jointed."

[25]By way of comparison, the Terms of the Trade, defines a mortise and tenon joint as: "A type of corner joint in which projections, called tenons, on one piece of lumber fit into slots, called mortises, on another piece." Terms of the Trade,

requirements of heading 4418, HTSUS, then including the words "tongued" and "grooved" in heading 4409, HTSUS, would be unnecessary.  Second, Customs has consistently classified wood products that were tongue-and-grooved under 4418, HTSUS. See, e.g., NY K82706 (Feb. 20, 2004); NY J87603 (Aug. 18, 2003); HQ 956363 (Sept. 2, 1994); HQ 955712 (Apr. 20, 1994); HQ 952940 (Mar. 24, 1993).  In fact, during discussions in the WCO on whether wood products which were tongue-and-grooved along all their edges and ends were classifiable under heading 4409, HTSUS, or heading 4418, HTSUS, the United States maintained that said products should be classified under heading 4418, HTSUS, because heading 4409, HTSUS, only included products tongue-and-grooved along their "edges," not "ends." Def.'s Mem. at 21-22.  To resolve this controversy, the WCO amended the Explanatory Notes to heading 4411, HTSUS; however, the United States did not acquiesce to this amendment. Id. Rather, it was only after the WCO amended heading 4409, HTSUS, that Customs finally classified wood products tongue-and-grooved along their ends

---

supra at 218, cf. Dictionary of Architecture and Construction supra at 602 ("A joint between two wood members that is formed by fitting a tenon at the end of the one member into a mortise in the other member . . . .") (emphasis in original).  A "dovetail" is an "interlocking joint used in cabinetry." Terms of the Trade at 106.  Lastly, a "tongue and groove" joint is "[l]umber machined to have a groove on one side and a protruding tongue on the other, so that pieces will fit snugly together, with the tongue of one fitting into the groove of the other." Id. at 344; cf. Dictionary of Architecture and Construction at 944 ("A joint formed by the insertion of the tongue of one member into the corresponding groove of another.").

in heading 4409, HTSUS, in 2002.  Id.[26]  Given that the amendment did not alter heading 4418, HTSUS, and that Customs still classifies some tongue-and-grooved flooring panels under heading 4418, HTSUS, this amendment did not necessarily disqualify fiberboard products having only tongue-and-grooved joints from heading 4418, HTSUS.[27] Because of the United States' position before the WCO, its long-standing practice that it still maintains, the fact that the common meanings of the joints involved do not contradict this position, and the Government's apparent unwillingness to support its own argument in briefing subsequent to its initial brief, the Court does not find the Government's attempt to distinguish Faus' product on the basis of its joints meritorious.

### v. Applying the law to the facts:

The Court must next determine whether Faus' merchandise has the

---

[26]Consequently, any meaning that attached with the amendment is inconsequential to this case as the entries occurred prior to 2002.  Pl.'s Mem. at 18-19 n.6, Pl.'s Reply at 4 n.4.

[27]Faus claims that this 2002 Amendment informs this case because it signaled that tongue-and-grooved wood should be classified under heading 4409, HTSUS, but left fiberboard under heading 4418, HTSUS.  This expressio unius est exclusio alterius argument is unpersuasive.  The WCO may have just been signaling that it was a mistake to classify tongue-and-grooved products under heading 4418, HTSUS, to begin with, not implicitly ratifying Custom's classification scheme.  Given that Faus does not cite any classification cases of fiberboard products raising this issue prior to the 2002 Amendment, heading 4411, HTSUS, may just not have been considered problematic, and therefore warranting amending by the WCO.

character and use befitting the term "builders' joinery." Using the definition established above, Faus' merchandise appears to be covered by heading 4418, HTSUS. Faus' flooring is designed to be: (a) assembled from many panels, sold together in sets of eight, and joined together by tongue-and-grooved joints, Flores Decl. at para. 11, 24; (b) used in the construction of a building in a non-structural role, id. at para. 10; and (c) as part of the finishing or woodwork of a building, id. at para. 9. Accordingly, the Court finds that Faus' merchandise meets the definition of "builders' joinery."

## B. Classification Under 4411, HTSUS

The Government contends that even if the merchandise qualifies as builders' joinery, the merchandise is nonetheless more specifically classifiable under subheading 4411, HTSUS. Heading 4411, HTSUS, covers "[f]iberboard of wood and other ligneous materials, whether or not bonded with resins or other organic substances."[28] Heading 4411, HTSUS, is an eo nomine provision as it "describes a commodity by a specific name." Am. Hardboard Ass'n v. United States, 12 CIT 714, 715 (1988). Because eo nomine "provision[s] include[] all forms of the named article unless

---

[28]Fiberboard is a "building material made of plant fibers, as wood, bonded together and compressed into rigid sheets." Webster's II New Riverside University Dictionary 474 (1988).

limited by [their] terms," id., "[a]n improvement in the merchandise provided for eo nomine does not remove it from classification under the eo nomine designation." Arthur J. Humphreys, Inc. v. United States, 973 F.2d 1554, 1556 (Fed. Cir. 1992). Because Chapter 44 includes not only input materials, like fiberboard, but products made from those input materials, some tension between various headings is unavoidable. Cf. heading 4411, HTSUS (covering "Fiberboard of wood or other ligneous materials") with Note 3 to Chapter 44 ("Headings 4414 to 4421 apply to articles of the respective descriptions of particle board or similar board, fiberboard, laminated wood or densified wood as they apply to such articles of wood."). Consequently, to resolve these tensions, the Court has long noted that "although an eo nomine provision covers all forms and varieties of the named commodity, there is a point where the addition of parts and functions transforms the object into something else." Am. Hardboard, 12 CIT at 716; see also Humphreys, 973 F.2d at 1556. The line demarcating heading 4411's, HTSUS, boundary is specified in Chapter Note 4. See GRI 1, HTSUS ("[C]lassification shall be determined according to the terms of the headings and any relative section or chapter notes and, provided such headings or notes do not otherwise require . . . ."); cf. Motor Wheel Corp. v. United States, 19 CIT 385, 388 (1995) (using a chapter note to demarcate the outer boundary of an eo nomine

provision).[29]


i. Meaning of Note 4:

Note 4 to Chapter 44 states that "[p]roducts of heading 4410,
4411 or 4412 may be worked to form the shapes provided for in
respect of the articles of heading 4409, curved, corrugated,
perforated, cut or formed to shapes other than square or rectangular

---

[29]Faus cites Arthur J. Humphreys, Inc. v. United States, 973
F.2d 1554 (Fed. Cir. 1992), Am. Plywood Ass'n v. United States,
17 CIT 613 (1993), and Am. Hardboard, 12 CIT 714 (1988) for the
proposition that "an input material can no longer be classified
under the tariff provision describing that input when it has been
advanced beyond the basic, fungible material to become a new and
different article of commerce."  Pl.'s Reply at 9-10 nn. 9, 11-
13.  However, reliance on this line of cases is misplaced. The
Court in Am. Hardboard, 12 CIT at 717, found "the legislative
history limits the eo nomine provision for hardboard to a basic,
fungible material." (emphasis added).  Cf. Arthur J. Humphreys,
973 F.2d at 1561 ("That holding [in Am. Hardboard] is consistent
with the Tariff Classification Study . . . .") (emphasis in
original); Am. Plywood, 17 CIT at 617 (relying on the Am.
Hardboard test). As the Court in Am. Hardboard made clear, "an eo
nomine provision includes all forms of the named article unless
limited by its terms, or contrary to legislative intent, judicial
decisions, long standing administrative practice, or demonstrated
commercial designation." 12 CIT at 715 (emphasis added).  By
setting a boundary condition for the eo nomine provision in
question based on  legislative history, the Am. Hardboard court
was not operating on a common law principle of statutory
construction in setting that boundary. But cf. Permagrain Prods.,
Inc. v. United States, 9 CIT 426, 435, 623 F. Supp. 1246, 1253
(1985) (relying on judicial authority to define this dividing
line).  Although the basic and fungible transformation test may
be appropriate where the HTSUS and the legislative history so
directs or is ambiguous, where, as here, the text directs a
specific test – i.e., the "character of articles of other
headings" test – the Court is bound by that test.

or submitted to any other operation provided it does not give them the character of articles of other headings."  When the relevant portions of 4409 are incorporated into this language, Note 4 to Chapter 44 specifies that products included in heading 4411 "may be [tongued, grooved, rebated, chamfered, V-jointed, beaded, molded, rounded,] curved, corrugated, perforated, cut or formed to shapes other than square or rectangular or submitted to any other operation provided it does not give them the character of articles of other headings."  Note 4 to Chapter 44, HTSUS (emphasis added).

The parties have submitted two competing interpretations of this Note.  The Government asserts that subjecting the merchandise to a specifically enumerated operation, regardless of whether that operation may give the merchandise the "character of articles in other headings," does not remove the merchandise from classification under heading 4411, HTSUS.  Def.'s Mem. at 11.  Rather, only if the merchandise is subjected to "any other operation" should the Court make a determination as to whether that operation gives the merchandise the "character of articles in other headings."  Id. Faus counters that the proper reading of Note 4 is that the merchandise may be submitted to any of the enumerated operations, or any other operation, so long as none of the enumerated, or other operations, give the merchandise the character of articles in other headings.  Pl.'s Mem. at 24-27, Pl.'s Reply at 5-8.  Faus argues that tonguing and grooving fiberboard allows panels to be joined

together, thereby giving them the character of builders' joinery.
Id.

These two plausible readings are created by the ambiguous antecedent of the word "it" in Note 4. "It" may refer to just the clause "submitted to any other operation," or alternatively to the entire list. The parties have proposed two schematics of the sentence:

| GOVERNMENT'S PROPOSED SCHEMATIC[30] | FAUS' PROPOSED SCHEMATIC[31] |
|---|---|
| [(1)] Worked to form the shapes provided for in respect of the articles of heading 4409, curved, corrugated, perforated, cut or formed to shapes other than square or rectangular or [(2)] submitted to any other operation provided it does not give them the character of articles of other headings. | [1] Worked to form the shapes provided for in respect of the articles of heading 4409, [2] curved, [3] corrugated, [4] perforated, [5] cut or formed to shapes other than square or rectangular or [6] submitted to any other operation provided it does not give them the character of articles of other headings. |

Although both readings are possible, the Court finds the Government's position is supported by the plain language and the legislative history of the provision.

The Government's reading is that the "provided it does not give them the character of articles of other headings" clause

---

[30]Def.'s Mem. at 11.

[31]Pl.'s Reply at 5.

(hereinafter the "'articles of other headings' clause") is a limitation on the preceding catch-all provision, the "submitted to any other operation" clause.  Catch-all provisions are designed "to save the legislature from spelling out in advance every contingency in which the statute could apply."   2A N. Singer, Statute & Statutory Construction § 47:17 at 281-82  (6th ed. 2000).  As with any general provision, a catch-all provision may be overinclusive unless somehow limited.  To cure this defect, courts frequently invoke the canon of statutory construction ejusdem generis to limit its scope.[32]  However, when, as here, there is no apparent pattern discernible from the enumerated operations to serve as a limiting principle, clauses of limitation are necessary.  Cf. Owen of Georgia, Inc. v. Shelby County, 648 F.2d 1084, 1097 n.3 (6th Cir. 1986) ("Ejusdem generis cannot be applied in a vacuum.") (Keith, J. dissenting).  Accordingly, it is reasonable that Congress intended the "articles of other headings" clause to limit the scope of the catch-all provision.[33]

---

[32]Ejusdem generis is "[a] canon of construction [holding] that when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same type as those listed." Black's Law Dictionary, supra at 556.

[33]This reading is also supported by the rules of grammar which provide that:

Referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent, which consists of the last word, phrase, or clause that can be made an antecedent without impairing

Under Faus' interpretation, the enumerated operations are incidental to the real inquiry: whether the products assume the character of products of other headings.  However, when the "articles of other headings" clause is combined with the catch-all provision, the five enumerated operations (or thirteen when the operations of heading 4409 are included) are completely subsumed by the last two clauses.[34]   Therefore, the list of enumerated

the meaning of the sentence.

Anhydrides & Chemicals, Inc. v. United States, 130 F.3d 1481, 1483 (Fed. Cir. 1997) (quoting C. Dallas Sands, 2A Sutherland Statutory Construction, 4th ed., § 47.33); cf. Carondelet Canal & Navigation Co. v. Louisiana, 233 U.S. 362, 382 (1914) ("The natural and grammatical use of a relative pronoun is to put it in close relation with its antecedent, its purpose being to connect the antecedent with a descriptive phrase."). Because "any other operation" is the last sensible antecedent, the qualifying words of the "characters of other headings" clause must modify only "any other operation."  Faus has suggested, as a general matter, this rule could lead to absurd results  Pl.'s Resp. Ct.'s Questions at 9.  However, the Court does not see why an absurd result would occur in this case by applying the rule.

[34]The only possible reason for the enumeration, under Faus' reading, would be to provide examples of "operations" out of an abundance of caution. Cf. Ft. Stewart Schools v. FLRA, 495 U.S. 641, 646 (1990) (citing to the principle of ex abundanti catuela).  However, the listing of thirteen examples would be ex abundanti catuela ad absurdum. Faus also asserts that the Court's reading would render the word "fiberboard" nugatory in Chapter Note 3.  See Pl.'s Resp. Ct.'s Questions at 7; see also Note 3 to Chapter 44 ("Headings 4414 to 4421 apply to articles of the respective descriptions of particle board or similar board, fiberboard, laminated wood or densified wood as they apply to such articles of wood.").  The Court finds Faus' argument unpersuasive for two reasons.  First, the only way for Faus' argument to be correct is if, under the Court's reading of Note 4, no fiberboard product could be classified under heading 4418, HTSUS.  However, this seems unlikely, especially for products like fiberboard doors or cellular wood panels.  Second, Chapter

operations becomes unnecessary under Faus' reading.

In choosing between two competing interpretations, the Court is mindful of the "'cardinal principle of statutory construction'" that "'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) (quoting Duncan v. Walker, 533 U.S. 167, 174 (2001)). This is especially true here where the drafters went to a great length to specifically enumerate thirteen separate operations to which fiberboard could be subjected. It is unlikely that the drafters would have gone to such great length only to have the entire list subsumed under the catch-all provision. Consequently, given that Faus' interpretation leads to surplusage, whereas the Government's does not, the Government's interpretation should be preferred.[35]

---

Note 4 is tailored specifically to the problem at issue here, whereas Chapter Note 3 is more general and does not necessarily even implicate the interplay between headings 4411 and 4418, HTSUS. Therefore, if the Court must chose between giving effect to the words in only one Note, the Court should prefer to give precedence to the words which speak directly to the issue at hand, i.e., Note 4. Cf. Chickasaw Nation v. United States, 534 U.S. 84, 94-95 (2001).

[35]The Government asserts that textual clues from Chapter 44 support its reading. Subheading 4411.29.20 covers fiberboard that is "[t]ongued, grooved or rabbetted continuously along any of its edges and dedicated for use in the construction of walls, ceilings or other parts of buildings." Def.'s Mem. at 14-15. The Government argues that Faus' interpretation would render this subheading a nullity as all products under this subheading would be subsumed by heading 4418, HTSUS, such that the subheading

This reading is reinforced by looking at the French version of Note 4.[36]  Like all drafting histories, recourse to the French version cannot supplant "the common, ordinary meaning derived from lexicographical sources."  Len-Ron Mfg. Co. v. United States, 334 F.3d 1304, 1312 (Fed. Cir. 2003).  Nevertheless, when the grammar of the English version is ambiguous, looking to the unambiguous French version may be highly probative of the intent of the drafters.  Cf.  Cardondelet Canal & Navigation Co. v. Louisiana, 233

---

would become surplusage.  Id.  Similarly, subheading 4410.32.00, which covers particle board "surface-covered with melamine-impregnated paper," would likely become a meaningless provision as well.  However, these subheadings could be preserved in at least three alternative ways: (1) the products are not builders' joinery; (2) that the operations do not give the products the character of articles of other headings; or (3) due to the Government's reading of "it" in Note 4.  Nonetheless, the Government is right in noting that at some point Faus' theory does break down.  Faus claims that looking to subheadings, before the proper heading is chosen, is precluded by Orlando Food Corp. v. United States, 140 F.3d 1437, 1440 (Fed. Cir. 1998).  See, e.g., Pl.'s Resp. Ct's Questions at 2 n.1.  The mistake committed by the trial court in Orlando Food was to classify goods only according to subheadings, rather than headings, violating GRI 1 and 6.  In contrast, here the Government only seeks to inform the meaning of the headings using canons of construction such as noscitur a sociis (known by its associates) and the canon seeking to avoid absurd results, i.e., rendering subheadings nugatory.  Moreover, if it is assumed that Congress created subheadings in which to classify products, then the subheadings must reflect Congressional understanding of the terms of the headings.

[36]The French provision is as follows: "Les produits des n°s 44.10, 44.11 ou 44.12 peuvent être travaillés de manière à obtenir les profils admis pour les bois du n° 44.09, cintrés, ondulés, perforés, découpés ou obtenus sous des formes autres que carrée ou rectangulaire ou sournis à toute autre ouvraison, pour autant que celle-ci ne leur confère pas le caractère d'articles d'autres positions."

U.S. 362, 387 (1914) (looking to the French version of the statute to clarify an ambiguous antecedent).[37]  As the Supreme Court explained in Cardondelet Canal, 233 U.S. at 387, "in French, there is more certain indication of the antecedent" because "[t]here is no neuter gender in the French language, every noun is masculine or feminine, and the pronoun which stands for it must agree with it." In the French version of Note 4, the "it" appears as "celle-ci" which is both feminine and singular.  As "sournis a toute autre ouvraison" (or any other operation) is feminine and singular, any other operation appears to be the antecedent to the word "it."[38]

### ii. Faus's Objections:

Faus directs the Court to the Explanatory Notes, which it claims clarifies the ambiguity.  Pl.'s Reply at 6.  The Explanatory

---

[37]As discussed above, because the Harmonized Schedule was intended as a uniform system used by many nations, Customs Co-Operation Council, supra at 22, it was drafted in English and French,  both versions "being equally authentic," Convention, Article 20.  Accordingly, the French and English were intended to be identical.

[38]Faus cites the Declaration of Marc Wilmet, an Emeritus Professor at the Free University of Brussels (Faculty of "Philsosphie et Lettres") suggesting that the word "manière" (manner) could also, and in his view more likely, be the antecedent to "celle-ci." Decl. Marc Wilmet, Ex. B to Pl.'s Resp. Ct.'s Questions.  However, "manière" (manner) does not appear to be a key word in the French version, which is especially evidenced by the fact that the word "manière" does not have an equivalent in the English version.  In other words, according to Professor Wilmet's translation, a non-existent word would be the antecedent in English.

Note to 44.11 states:

> The products of this heading remain classified herein whether or not they have been worked to form the shapes provided for in respect of the goods of heading 44.09, curved, corrugated, perforated, cut or formed to shapes other than square or rectangular and whether or not they have been surface or edge worked, or coated or covered (e.g., with textile fabric, plastics, paint, paper or metal) or submitted to any other operation, <u>provided these operations</u> do not thereby give such products the essential character of articles of other headings.

Explanatory Note 44.11 (emphasis added to "these operations"). Faus argues that the Explanatory Notes' choice of the word "these," clarifies the word "it" in the Chapter Note. Pl.'s Reply at 6. By using the word "these," Faus contends, the "articles of other headings clause" must refer to multiple operations.

The text of the Explanatory Note has four major variances from Note 4: (1) the Explanatory Note adds "and whether or not they have been surface or edge worked, or coated or covered (e.g., with textile fabric, plastics, paint, paper or metal)"; (2) the inclusion of a comma after "other operation" and before "provided"; (3) the change from "it" to "these"; and (4) the addition of the word "essential" before the word "character." Unfortunately, the "these" is plagued by as many ambiguities as the "it." "These operations" has three possible antecedents; "these" may refer (a) to each of the enumerated operations and catch-all provision; (b) to the surface and edge worked, covered, coated and the catch-all provision;[39,40] or

---

[39]As of 1995, the Explanatory Note and Chapter Note employed the same language. Then in 1995, the language of the Explanatory

(c) to just the catch-all provision.  All three readings would

---

Note changed after an inquiry of the Lebanese Delegation to the WCO as to certain particle board strips, grooved on their edges and covered with laminated plastic which were to be used for self assembly into drawers.  See Harmonized System Committee, World Customs Organization, Doc. 39.581 E (Sept. 28, 1995); Harmonized System Committee, World Customs Organization, Doc. 39.552 E (Sept. 20, 1995). Upon the request of the United States, the Secretariat was asked to prepare "suitable amendments to the Explanatory Notes to heading 44.10 for consideration by the Working Party to clarify the extent to which products could be covered with plastics, etc., and still remain classifiable in that heading."  Doc. 39.552 E at para. 5.  Because Chapter Note 4 covers both 4410 and 4411, HTSUS, the Explanatory Notes for both were amended.  Therefore, as the amendment was intended to cover these contingencies, reading (b) is probably best supported by the legislative history.  Consequently, the WCO decided the particle board drawers should remain in 4410, HTSUS.  Doc. 39.581 E at para. 4.

| OTHER POSSIBLE READING | FAUS' PROPOSED SCHEMATIC |
|---|---|
| [1] Worked to form the shapes provided for in respect of the articles of heading 4409, curved, corrugated, perforated, cut or formed to shapes other than square or rectangular and [2] whether or not they have been surface or edge worked, or coated or covered (e.g., with textile fabric, plastics, paint, paper or metal) or submitted to any other operation, provided these operations do not thereby give such products the essential character of articles of other headings. | [1] Worked to form the shapes provided for in respect of the articles of heading 4409, [2] curved, [3] corrugated, [4] perforated, [5] cut or formed to shapes other than square or rectangular and whether or not they have been surface or edge worked, or coated or covered (e.g., with textile fabric, plastics, paint, paper or metal) or [6] submitted to any other operation, provided these operations do not thereby give such products the essential character of articles of other headings. |

justify the substitution of the word "these" for "it."  Because the
Explanatory Notes "do not constitute controlling legislative history
but nonetheless are intended to clarify the scope of [the] HTSUS []
and to offer guidance" in its interpretation, Mita Copystar America
v. United States, 21 F.3d 1079, 1082 (1994), their use is defeated
when the Explanatory Notes are as, or more, ambiguous than the text.
Consequently,  the  Explanatory  Notes  cannot  assist  the  Court's
inquiry.  Cf. Stadelman, 242 F.3d at 1048 ("To determine the meaning
of a tariff classification term, only the term used in the tariff
classification may be analyzed.").

Faus also points to Motor Wheel Corp. v. United States, 19 CIT
385 (1995) to support its position.  Pl.'s Mem. at 24.  In Motor
Wheel, the Court interpreted Chapter Note 72(1)(k) which provides:

> Flat-rolled products of a shape other than rectangular or
> square, of any size, are to be classified as products of
> a width of 600 mm or more, provided that they do not
> assume the character of articles or products of their
> headings.

Motor Wheel, 19 CIT at 388 (emphasis in orginal).  Note 72(1)(k) has
an exclusionary nature – it excludes products from an eo nomine
provision once they assume certain characteristics.  Faus is correct
in noting that Note 72(1)(k) is similar to Note 44(4) in that it
establishes the boundary for an eo nomine provision.  However, it
does not necessarily follow that the two notes set that boundary in
the same way.  The HTSUS uses many different types of provisions to
help locate goods in a particular heading.  Besides an exclusionary

form, the HTSUS also employs chapter notes with a more inclusionary character.    For example, Note 6 to Chapter 85 states that "[r]ecords, tapes and other media of heading 8523 or 8524 remain classified in those headings, whether or not they  entered with the apparatus for which they are intended."  Chapter 85, Note 6, HTSUS. The language, "remain classified," suggests that goods remain in a particular heading even if they may assume the character, i.e., entering with apparatus, of other headings.  The question in this case is which of the two forms did the drafters employ in Note 4? The drafters may have intended Chapter Notes 44(4) and 72(1)(k) to accomplish the same ends, or Congress may have intended the catch-all  provision  to  follow  the  72(1)(k)  form  but  the  enumerated operations to follow the 86(6) form.  Motor Wheel does not assist the Court in resolving this question, and the Court's construction of Note 4 stands in opposition to the 72(1)(k) form.  Therefore, reliance on Motor Wheel is misplaced.


### iii. Applying Note 4:

Given that the Court deems that "the character of articles of other headings" test only applies to the catch-all provision, only operations not listed within Chapter Note 4, and which give products the character of articles of other headings, exclude a product from heading 4411, HTSUS.  Therefore, tonguing and grooving fiberboard, per se, does not render the merchandise unclassifiable under heading

4411, HTSUS.

Faus asserts that even under this restricted reading its merchandise is still not classifiable under heading 4411, HTSUS. Pl.'s Reply at 7 n.7. Faus claims that a "top layer or wear layer, consisting of a combination of corundum and melamine, must be added to the Faus products to make them fit for their intended use"; therefore, its merchandise has been subjected to an "other operation." Id. Because Faus submits that its merchandise has been subjected to an "other operation," Note 4 next requires that this operation give the merchandise the "the character of articles of other headings." Chapter 44, Note 4, HTSUS.

The word "character" admits of many degrees. An operation may give the product "any character," i.e., an operation that transforms a product into fiberboard which thereby gives the product the character of articles in heading 4418, HTSUS, by virtue of Note 3 to Chapter 44; or "a necessary character," i.e., an operation that gives a product one of the required attributes in another heading; or the "essential character," i.e., an operation which gives a character which differentiates articles of other headings. In deciding which of these alternatives to choose, the Explanatory Notes offer guidance. Specifically, the Explanatory Notes direct that fiberboard articles may remain classifiable under heading 4411, HTSUS, "whether or not they have been surface or edge worked, or coated or covered (e.g., with textile fabric, plastics, paint, paper

or metal) or submitted to any other operation, <u>provided</u> these operations do not thereby give such products the <u>essential</u> <u>character</u> of articles of other headings." EN 44.11(emphasis added).

Significantly, the Explanatory Notes for heading 4411, HTSUS, specify that "[i]mpregnating or other agents may also be added during or after manufacture of the board to give an extra property, e.g. impermeability to water or resistance to rot, insect attack, fire or the spread of flame." <u>See</u> EN 44.11; <u>see also</u> Chapter 44, Additional U.S. Note 1(c), HTSUS ("The term '<u>surface covered</u>,'as applied to articles of headings 4411 and 4412, means that one or more exterior surfaces of a product have been treated with creosote or other wood preservatives, or with fillers, sealers, waxes, oils, stains, varnishes, paints or enamels, or have been overlaid with paper, fabric, plastics, base metal, or other material.").[41] In other words, products of heading 4411, HTSUS, may be surface covered. Because surface covering does not, by itself, give a fiberboard product a character differentiating it from articles under heading 4411, HTSUS, this operation cannot give it "the essential character of articles of other heading." <u>Cf.</u> <u>Doc. 39.552</u>

---

[41]During oral argument, Faus attempted to differentiate lamination from other types of surface covering because lamination was a sophisticated process. Although the Court does not deny that the lamination process used by Faus may be sophisticated, the fact that it is sophisticated does not transform the operation into anything more than covering a fiberboard product with paper, i.e., a color photograph of wood strips, <u>see Flores Decl.</u> at para. 5, and then with a melamine (or plastic) layer, <u>id.</u>

E at para. 5 (discussed supra at note 40).


## C. Choosing the Proper Heading

Because the merchandise appears to be prima facie classifiable under two headings, the Court must now decide which is the preferred heading.  Under GRI 1, HTSUS, goods should first be classified according to the terms of the headings and relevant chapter notes. Park B. Smith, Ltd. v. United States, 347 F.3d 922, 928 (Fed. Cir. 2003) ("Rule 3(a) is applied after the prior rules, and does not override any section or chapter notes.").  However, if this is insufficient, GRI 3, HTSUS, provides an additional set of rules for choosing between possible headings.  Orlando Food, 140 F.3d at 1441.


### i. GRI 1 Analysis:[42]

Looking first to the relevant headings and chapter notes, Chapter Note 4 is the only possible candidate for directing the

---

[42]Faus has argued that Note 4 to Chapter 44 makes heading 4411, HTSUS, "mutually exclusive" with other provisions in the HTSUS.  Pl.'s Mem. at 24.  However, for the reasons set forth in this subsection, Faus' reading is not entirely accurate as a matter of law.  This analysis further undermines the significance Faus places on Note 4 as being dispositive of how products are allocated among the headings in Chapter 44.

Faus has expressed concern that the Court's reading of Note 4 to Chapter 44 may upset the classification of fiberboard dashboards under heading 8708, HTSUS.  Dashboards are not described eo nomine under heading 8708, HTSUS.  Moreover, because Note 4 does not require that products classifiable under heading 4411, HTSUS, not be classifiable elsewhere, products may be classified in other headings if GRI 3 so directs.

classification of products between the relevant headings. As discussed above, Chapter Note 4 instructs that the "[p]roducts of heading 4410, 4411 or 4412 <u>may be</u> worked . . . ."[43] (emphasis added). Courts have long noted that the language of a heading or chapter note may direct that one tariff provision takes precedence over any conflicting tariff provisions under the doctrine of invasive language. <u>See, e.g.</u>, <u>American SF Products, Inc. v. United States,</u> 61 Cust. Ct. 257, 262 (1968) (headnotes containing an invading character eliminate relative specificity from consideration); <u>Swiss Manufactures Ass'n., Inc. v. United States</u>, 39 Cust. Ct. 227, 237 (1957) (one provision may take precedence over every other provision of the tariff act). However, as the court in <u>Swiss Manufactures</u> noted, the doctrine of invasive language "has never been applied except in cases where the language of the invading provision 'is so sweeping, clear, and definite as to the goods subjected to its operation that there is no room for interpretation as to the goods which Congress meant to include.'" <u>Swiss Manufactures</u>, 39 Cust. Ct. at 237 (quoting <u>Kayser & Co. (Inc.) v. United States</u>, 13 Ct. Cust. App. 474, 479 (1925)). The court went on to provide examples of invasive language such as: "'whether

---

[43]Chapter 44 Note 4, HTSUS. The Explanatory Note for 44.11 uses slightly different language: "The Products of this heading <u>remain</u> classified herein whether or not" they have been submitted to certain operations. Because the language of the Chapter Note and Explanatory Note covers the same material, but in a different manner, the language of the Chapter Note must govern.

or not more specifically provided for elsewhere, or 'by whatever name known,' and to 'wherever use applied, and whether or not named, described, or provided for elsewhere in this Act.'" Id. (citations omitted). When viewed under this framework, given the equivocal connotation of the word "may," the language "may be worked . . ." is insufficient to constitute a clear statement of Congressional intent to have 4411, HTSUS, take precedence over competing headings. Cf. Pillowtex, 21 CIT at 1157, 983 F. Supp. at 191.


### ii. GRI 3 Analysis:

Because GRI 1 is not dispositive, the Court must look to GRI 3, HTSUS, to provide additional guidance. According to GRI 3(a), "[t]he heading which provides the most specific description shall be preferred to headings providing a more general description." Under this so-called rule of relative specificity, a court looks to "the provision with requirements that are more difficult to satisfy and that describe the article with the greatest degree of accuracy and certainty." Orlando Food Corp. v. United States, 140 F.3d 1437, 1441 (Fed. Cir. 1998).[44]

---

[44]In conducting this inquiry the Court holds that Faus' flooring panels are not "assembled parquet panels." The Oxford English Dictionary defines "assemble" as "[t]o put together (the separately manufactured parts of a composite machine or mechanical appliance.)" I Oxford English Dictionary, supra at 705; see also Webster's II New Riverside University Dictionary 131 (1988) ("Assemble" means "[t]o fit or join together the parts of."). The flooring panels, as imported, are not made from parquet strips which have been "put together." Rather, the

As discussed above, heading 4418, HTSUS is quite broad, covering everything from assembled parquet panels, to structural beams, to shingles and shakes. Although it is not a basket provision, it covers a myriad of products with only one commonality: the products are used in the construction of buildings. Moreover, it includes products that can be joined by a wide variety joints and other means. Additionally, products under heading 4418, HTSUS, may be made from "particle board or similar board, fiberboard, laminated wood or densified wood." Note 3 to Chapter 44.

In contrast, products falling under heading 4411, HTSUS, are limited to fiberboard, i.e., boards and panels, by Chapter Note 4.

---

panels only have this appearance due to a color photograph of wood flooring which is imposed upon a piece of fiberboard. This reading is exemplified by two aspects of the text. First, the definition of builders' joinery requires either that the products be assembled or have joints for assembly. Because parquet panels are assembled, they fall under heading 4418, HTSUS, regardless of their type of joint. For example, EN 44.18 specifically notes that assembled parquet panels may be tongue-and-grooved, excepting them from heading 4409, HTSUS, which specifically includes wood products which are tongue-and-grooved. Second, the term "assembled parquet panels" is specifically contrasted with the term "unassembled parquet panels" in heading 4409, HTSUS. This distinction reveals that a degree of woodworking, i.e., that which is required to assemble parquet strips, is mandated to render a product an assembled parquet panel. Moreover, Faus' reliance on GRI 2(a) is misplaced. GRI 2(a) states that "[a]ny reference in a heading to an article shall be taken to . . . include a reference to that article complete or finished, . . . entered unassembled or disassembled." However, GRI 1 limits the scope of GRI 2 to only those situations where "such headings or notes do not otherwise require." Here, the term "assembled" in heading 4418, HTSUS, especially as contrasted by the term "unassembled" in heading 4409, HTSUS, clearly indicates that heading 4418, HTSUS, only covers assembled parquet panels.

Cf. EN 44.11 ("Impregnating or other agents may also be added during or after manufacture of the board . . . .") (emphasis added). Because of Chapter Note 4, fiberboard products may only be given certain types of joints without rendering them classifiable elsewhere. For example, if fiberboard is actually joined with other pieces of fiberboard or wood, this "joinery" would be subjected to an "other operation," i.e., being joined with glue or nails, etc., which most likely would give the fiberboard product the character of articles of other headings. What this means is that there are few transformations to which fiberboard may be subjected and remain classifiable under heading 4411, HTSUS. Accordingly, heading 4411, HTSUS, is limited in the types of products it includes to unjoined fiberboard boards and panels. This description much more closely resembles the flooring panels in question than "builders' joinery." Cf. Russ Berrie & Co., Inc. v. United States, 381 F.3d 1334, 1337-38 (Fed. Cir. 2004)

Faus argues, inter alia, that heading 4418, HTSUS, is more specific because it is more difficult to satisfy, i.e., a product must meet the three-prong test for builders' joinery. Pl.'s Resp. Ct.'s Questions at 12. Faus attempts to read the court's language in Orlando Food, i.e., "the provision with requirements that are more difficult to satisfy and that describe the article with the greatest degree of accuracy and certainty," as proposing that the more difficult provision to satisfy is necessarily the more

specific.   Pl.'s Resp. Ct.'s Questions at 12-13.[45]   However, the

Court does not read the Orlando Food test as supporting this

proposition.   First, difficulty is not measured by the number of

requirements in the definition of the heading, but the relative

particularity thereof.[46]   Cf. Mitsui Petrochemicals (Am.), Ltd. v

---

[45]At oral argument, Faus argued that the relative specificity
analysis was predicated on the "more difficult to satisfy" test.

[46]In relevant part, GRI 3 specifies that "[t]he heading
which provides the most specific description shall be preferred
to headings providing a more general description."  The "relative
specificity analysis," as construed by U.S. Courts, is an
outgrowth of General Headnote 10(c) of the TSUS, which in turn
was a codification of a "judicial aid to construction" developed
by U.S. Courts in the latter half of the nineteenth century to
prefer the most specific heading in classifying goods. See Arthur
v. Stephani, 96 U.S. 125, 126-27 (1877), Homer v. The Collector,
68 U.S. 486, 490 (1863); see also Mitsui Petrochemicals, 21 CIT
at 886-87 (providing a good history of the relative specificity
analysis).  This rule was described most clearly in Fink v.
United States, 170 U.S. 584, 587 (1898) which stated: "The rule
[of relative specificity] is that [], if possible, [the preferred
heading] is to be determined by ascertaining whether one of the
two paragraphs is more definite in its application to the article
in question than is the other."
     Later, the "more difficult to satisfy" formulation
originated in United States v. Electrolux Corp., 46 CCPA 143
(1959).  Relying on Fink, the court in Electrolux Corp. compared
the breadth of two competing provisions holding that a provision
was "more specific because it [was] less easily satisfied."
Electrolux Corp., 46 CCPA at 148.  This language was
characterized by the court in United States v. Simon Saw & Steel
Co., 51 CCPA 33, 40 (1964) as standing for the proposition that
"the more specific provision is the one having requirements which
are more difficult to satisfy" – the articulation of the rule of
relative specificity on which Faus relies.   The Court in Simon
Saw & Steel did not discuss the principles of this test nor
announce that it was breaking new ground.  Rather, the court
maintained that the "less specific" provision covered "cutting
tools of any description or any kind, and in fact lists six
different kinds of cutting tools in its first provision . . . The
common (dictionary) meaning of the named cutting tools includes a

United States, 21 CIT 882, 888 (1997) (subheading 3811.29.20 embodies "a smaller number of compounds since it has requirements that are 'more difficult to satisfy'"), Dollar Trading Corp. v. United States, 64 Cust. Ct. 153, 157-58 (1970) ("because a multitude of hand-operated articles of varying types and designs can be classified under the provisions for hand tools while only a few types of articles . . . are capable of satisfying the requirements of the brush provisions," the latter described heading is more difficult satisfy); cf. United States v. Siemens Am., Inc., 68 CCPA 62, 70 (1981).  Although the heading with more requirements may in some cases be the more specific, this proposition does not necessarily hold true in all cases.  For example, in this case as contrasted with Orlando Food, the input provision, i.e., heading 4411, HTSUS, is limited by Note 4; to wit, Note 4 places a cap on the products classifiable therein.  Accordingly, this makes heading 4411, HTSUS, restrictive in the types of products it covers.  It is not an open-ended provision like the one deemed "less specific" in Orlando Food.  Moreover, the specific requirements of heading 4411, HTSUS, describe the flooring panels with greater accuracy than

---

great many different types."  Id. at 41.  In contrast, the more specific provision included "only one article [] capable of qualifying as a circular saw."  Id.
    Given this history, it is apparent that the "difficult" was not meant to be a separate or distinct test from the "accuracy and certainty" test; and there is no indication that the more "difficult to satisfy" test was meant to trump concerns of accuracy and certainty.

heading 4418, HTSUS.

Second, by virtue of Note 4, there is more certainty that Faus'
flooring panels are classifiable under heading 4411, HTSUS.  As
Chapter Note 4 specifies, articles of heading 4411, HTSUS, may be
tongue-and-grooved; this provides some certainty as to the
classification of tongue-and-grooved products therein.[47]  In
contrast, there is no certainty that tongue-and-grooved products
necessarily even fall under heading 4418, HTSUS.  Faus' reading of
the Orlando Food test would, in this case, place the "certainty" and
"difficulty" prongs of the test in tension.[48]

Third, Faus cites to the principle that a "use" provision
trumps an eo nomine provision under a relative specificity analysis.

---

[47]If fiberboard products are given mortise and tenon or
dovetail joints, the fiberboard would be submitted to an "other
operation" rendering them classifiable under heading 4418, HTSUS
(or elsewhere if the circumstances so warranted).  In contrast,
given the Court's construction of Note 4, tongue-and-grooved
products may be classified under heading 4411, HTSUS.
Accordingly, this gives some certainty regarding the type of
joints products classifiable under 4411, HTSUS, may have.

[48]Faus has admitted that headings covering input materials
may be more specific than builders' joinery.  For example, the
means by which Faus reconciles the placement of tongue-and-
grooved products under heading 4409, HTSUS, with its proposed
construction of Chapter 44, is to suggest that heading 4409,
HTSUS, is the more specific provision.  Pl.'s Mem. at 19-20,
Pl.'s Reply at 4.  By virtue of the Court's construction of Note
4, heading 4409 and heading 4411 bear many similarities,
including the fact that their products may be tongue-and-grooved.
Therefore, there is no reason that a different result should
obtain.  The Court further notes that this may be the purpose of
Chapter Note 4, i.e., to align the outer boundaries of headings
4410-4412, HTSUS, with heading 4409, HTSUS.

Pl.'s Resp. Ct.'s Questions at 14-17.[49]   As the case law reveals, this principle is only a "rule of thumb" and should only be employed when the two tariff headings sit in equipoise.  Carl-Zeiss, Inc. v. United States, 195 F.3d 1375, 1380-81 (Fed. Cir. 1999), Simon Saw & Steel Co., 51 CCPA at 40.  Because the Court finds that heading 4411, HTSUS, is more specific, the two competing provisions do not sit in equipoise.

Accordingly, the Court deems that heading 4411, HTSUS, is the more specific heading and therefore the heading under which Faus' merchandise is classified.


## II. Choosing the Proper Subheading

Relying on the outcome in Witex, USA, Inc. v. United States, slip op. 04-144 (CIT Nov. 15, 2004), a companion case dealing with the classification of similar panels under heading 4411, HTSUS, the parties did not independently brief under which subheading Faus' merchandise would fall if the panels were classifiable under heading 4411, HTSUS.  Because the Court in Witex held that neither party had sufficiently established a commercial meaning for "tileboard" at the summary judgment phase, the Court did not resolve the meaning of "tileboard."   Accordingly, because the Parties here have incorporated the arguments from Witex by reference, the inability

---

[49]At oral argument, the Government disputed that heading 4418, HTSUS, was a use provision. The Court does not express an opinion on this issue.

of the Court in <u>Witex</u> to resolve issues on the summary judgment applies to the record in this case.  Therefore, for the reasons stated in <u>Witex</u>, summary judgment is inappropriate.


**CONCLUSION**

Because the Court finds the record insufficient to establish a commercial designation for the term "tileboard," or exclude the possibility thereof, the cross motions for summary judgment are denied.  The parties shall jointly prepare an order governing preparation for trial and submit it to the Court by December 15, 2004.


It is so ORDERED.


                                         <u>  /s/ Donald C. Pogue  </u>
                                            Donald C. Pogue
                                                 Judge



November 15, 2004
New York, New York